724 So.2d 124 (1998)
Zacarias Jaime IZQUIERDO, Appellant,
v.
The STATE of Florida, Appellee.
No. 97-3020.
District Court of Appeal of Florida, Third District.
November 18, 1998.
Rehearing Denied December 30, 1998.
*125 Bennett H. Brummer, Public Defender and Frank P. Triola, Special Assistant Public Defender, for appellant.
Robert A. Butterworth, Attorney General and Maurice J. Houston (Fort Lauderdale) and Maya Saxena (Fort Lauderdale), Assistant Attorneys General, for appellee.
Before SCHWARTZ, C.J., and GERSTEN and GREEN, JJ.
SCHWARTZ, Chief Judge.
This is an appeal from a conviction for felony littering after a jury trial. As was the case in Boyer v. State, 713 So.2d 1133, 1133-34 (Fla. 5th DCA 1998),
[o]ur review of the record reveals that the trial court was unable to control the conduct of the overzealous prosecutor .... [whose] improper comments ... were [so] inflammatory and prejudicial in nature, [that they] vitiated the defendant's right to a fair trial.
Referring only to the highlights of the improprieties committed by Assistant State Attorney Harvey Hyman,[1] which are both breathtaking in their number, variety, and gravity and perhaps unprecedented even in our long and dreary experience with this problem, we note that (1) after stating to the trial judge that he could not establish a particular incriminating fact against the defendant, he deliberately sought to elicit just that information by a misleading question to a police officer (2) he engaged in name-calling of Izquierdo and his case both, as in Gore v. State, 23 FLW S518, 719 So.2d 1197 (Fla.1998), by aggressively confronting him on the witness stand, and in final argument, when he referred to the defense as a "pathetic fantasy," and (3) he repeatedly and improperly appealed to the jury's sympathy and emotions,[2] as, for example, by asking it to *126 consider the effects a crime such as this has on "the water we drink, the air we breathe, the ground our children play on."
Because the conduct was not only far from harmless, compare Lewis v. State, 711 So.2d 205 (Fla. 3d DCA 1998), but fundamentally wrong, see Peterson v. State, 376 So.2d 1230 (Fla. 4th DCA 1979), cert. denied, 386 So.2d 642 (Fla.1980), we are compelled to set aside the judgment below. After remand, the trial court may, in its reviewable discretion, either grant a new trial or dismiss the case outright if it finds that the prosecutorial misconduct, particularly considering the possibility that the office of the State Attorney was itself directly implicated by retaining Hyman after notice of his proclivities, was so pervasive that the defendant was deprived of due process. See Munoz v. State, 629 So.2d 90, 98 (Fla.1993).
Vacated, remanded.
NOTES
[1] Hyman is not a stranger. This is the third time we have been forced to deal with his indulgence in what is often euphemistically called "overzealous advocacy," but is really just unprofessional and unethical behavior. See Lewis v. State, 711 So.2d 205 (Fla. 3d DCA 1998); State v. Benton, 662 So.2d 1364 (Fla. 3d DCA 1995). We therefore now fulfill the promise of Lewis, 711 So.2d at 208 n. 1, and refer him to the Florida Bar. It is respectfully requested that the Bar advise this court as to the ultimate result.
[2] Under the circumstances, we consider that the summary of the events at the trial contained in the argument section of the brief of the appellant is, if anything, fair and restrained:

In the case before this Court, there were at least eight instances of misconduct by the prosecutor as detailed by the necessarily lengthy Statement of the Case and Facts. There was a violation of a pre-trial motion in limine that referred to a prior incident of dumping which was ruled inadmissible by the trial court. (TR. 158-161, 218). The prosecutor asked a defense witness didn't he know that his alleged company was under investigation for illegal dumping, thus alluding to other unproven and irrelevant cases of illegal dumping with no connection to this Appellant. (TR 201). Next, during the testimony of the Appellant, the prosecutor threatened him to admit something which the Appellant testified he did not know or he would call the police officer back for the truth.2 (TR.236). The prosecutor challenged the Appellant asking him if his defense witness was a liar. (TR.240). The prosecutor placed a burden on the defense by asking the Appellant if he brought the paperwork from the D.O.T [sic] weigh station for the jury. (TR.245). Even after an immediate instruction by the trial court that the defense has no burden, the prosecutor replied to the Appellant that he remembered to bring his commando stuff to trial (still inferring he did not bring the D.O.T. paperwork). (TR.245). On three separate occasions during the cross-examination of the Appellant, the prosecutor told the Appellant that this case was not important to him, the third time referring to a conversation in Spanish making the prosecutor himself a witness and saying that he (the prosecutor) heard the statement allegedly made by the Appellant.4 (TR.241, 245, 250). At one point during cross-examination, after being specifically instructed by the trial court to make no improper comments and simply ask legal questions, the prosecutor told the Appellant, "That's all we need to know. This is painful-." (TR.253).
Finally and subsequent to the trial court's admonition to the prosecutor that he was dangerously close to a mistrial, during his closing argument, the prosecutor began by immediately appealing to the sympathy of the jurors by asking them to consider the affects[sic] this crime has on the water we drink, on the air we breathe and on the ground where our children play. He called the defense some `pathetic fantasy' in comparison to the state's case which was based on reality. (TR.272). He insulted the Appellant by asking the jurors if they would buy an umbrella if he told them it was raining inside the courthouse. (TR.274-275). He finally told the jurors it was their province to "go bankrupt" and acquit the Appellant if they chose too [sic]. (TR.276).
2 Note that in response to a prior question by the trial court whether the state had a witness that would testify the documents actually came from the truck the appellant was driving, the prosecutor responded that the officers didn't know and there were numerous documents recovered from both trucks. (TR.194-195). The prosecutor's question about calling the officer "to tell the truth" was baseless by his own admission.
4 The statement was allegedly made in Spanish to a Clerk who was not present at the time. (R.7,9). There is no evidence that this prosecutor speaks and/or understands the Spanish language to make a statement of fact like that in front of the jurors. (TR.250).