743 So.2d 52 (1999)
Gerald W. HENRY, Appellant,
v.
STATE of Florida, Appellee.
No. 97-1713.
District Court of Appeal of Florida, Fifth District.
August 20, 1999.
Rehearing Denied October 14, 1999.
*53 James B. Gibson, Public Defender, and Rosemarie Farrell, Assistant Public Defender, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Carmen F. Corrente, Assistant Attorney General, Daytona Beach, for Appellee.
COBB, J.
The appellant, Gerald Henry, convicted of second degree murder, has filed a belated appeal seeking a new trial on the ground, inter alia, of prejudicial prosecutorial excesses.
Henry was indicted for first degree murder as the result of shooting one James Berry in the back of the head outside of a bar at the end of Bike Week in Volusia County in 1994. At the time of the incident Berry was engaged in a verbal tirade directed at the proprietress of the bar, a Mrs. Tindell, and (according to the state's witnesses) was cursing and threatening her because she had refused him service. As Berry "went for" Mrs. Tindell outside of the bar he was shot. Henry testified that he was attempting to protect Tindell by striking Berry on the back of the head with a .45 pistol, which accidentally discharged.
A state's witness, one Charles Bagwell, testified that he was in the bar at the Embassy Lounge getting a drink when he noticed two men, including the victim, giving the proprietress, Mrs. Tindell, a "hard time across the bar, reaching for her trying to slap at her." The two men then tried to get through a pass-through behind the bar and were "cussing and raising Cain." Ms. Tindell forced the two men to leave, but they said they'd be back. Bagwell said that both men looked "dangerous," but that they left. Bagwell also testified that he thought the victim was on drugs, because he was so "mean." Bagwell approached Ms. Tindell, who was a friend, and the two of them walked out onto the porch since she was "shaking so bad she couldn't hardly stand up." Bagwell was just trying to "calm her down." As they stood on the back deck, the victim came up to the side of the deck near the step, without his friend. The victim "was cussing Ms. Tindell, calling her pretty bad names, raising Cain at her, and then came up on the deck still fussing and raising Cain." After raising "Cain" on the steps and on the deck, the victim "went for" Ms. Tindell. Bagwell testified that he was himself getting ready to intervene, since the victim "had his arms up reaching for her."
The prosecutor at trial, with no evidentiary support, referred to Henry as a killer who was out to establish his reputation with his biker club and suggested (falsely) that Henry was a member of the "Outlaws." He also referred to Henry as a cold-blooded killer, termed the latter's version of events (which was not contradicted by any state witness) as the "most ridiculous defense" he, the prosecutor, had ever heard, and expressed his personal belief in Henry's guilt.
*54 Based upon the recent Florida Supreme Court opinion in Ruiz v. State, 24 Fla. L. Weekly S157, 743 So.2d 1 (Fla.1999), we reverse Henry's conviction, vacate his sentence, and remand for a new trial. See also, Kent v. State, 702 So.2d 265 (Fla. 5th DCA 1997), rev. denied, 717 So.2d 533 (Fla.1998); Fuller v. State, 540 So.2d 182 (Fla. 5th DCA 1989).
REVERSED AND REMANDED.
HARRIS, J., concurs and concurs specially with opinion.
GRIFFIN, J., dissents with opinion.
HARRIS, J., concurring and concurring specially:
In cases involving unprofessional closing arguments, the appellate courts have long debated the relative importance of justice (a decision based solely on the facts and the law) as opposed to procedure. Those who argue for justice contend that if the improper comments by counsel affect[1] the outcome of the trial, justice requires a new trial. Those who argue for procedure claim that judicial efficiency and the rights of the party who benefits from the unethical argument should prevail unless a proper objection is timely made.
The supreme court, based on its two older decisions on the subject, has heretofore championed the view that justice should prevail over procedure when the improper closing argument affected the result of the case. In Ruiz, at least insofar as capital cases are concerned, the supreme court has recently and emphatically again come down on the side of justice. The dissent attempts to limit Ruiz to capital cases. But it is not only criminal defendants who are entitled to a fair trial; so also are civil plaintiffs and defendants. Justice is more than capital cases; justice is the court's stock-in-trade. It is the reason for our existence. Whether in a small claims court or the supreme court, a fair trial simply should not be denied because of the unethical conduct of an officer of the court.
How can we as a court preach professionalism while, at the same time, we observe improper and prejudicial closing argument and, by our refusal to act, give our imprimatur to this most unprofessional conduct? Judicial ratification of an unfair verdict resulting from lawyer misconduct is made no more palatable because the other lawyer fails to timely object or because the trial judge refuses to get involved.
An unfair verdict based on unethical lawyer conduct does not merely injure the unfortunate party suffering the loss. It injures every lawyer, every judge and the very foundation of our profession. It diminishes our credibility. We, as courts, lessen the value of our product, a fair trial for everyone, when we permit an unfair result knowing that it is the product of the unethical conduct of one under our supervision and one who has sworn to abide by the Rules of Professional Conduct.[2] Worse, we appellate judges have washed our hands of the problem and have instead chosen to admonish trial judges for not properly controlling their courts by preventing unethical argument even in the absence of an objection, but then deny relief to the aggrieved party who suffers because of the trial judge's abdication of *55 responsibility because an objection was not timely made. Go explain it.
Counsel's conduct in this case was highly inappropriate and prejudicial. In particular, there was no basis at all in the record to indicate that Henry killed Berry to "make his reputation with his biker club." There is no indication in the record that membership in a biker club played any role in Henry's conduct or even that the biker club with which Henry was associated was anything other than a loosely-knit social club of non-violent citizens who simply enjoy motorcycles. Many such groups frequent this area during bike week. In order to make up for this lack of evidence, the prosecutor invoked the reputation of the "Outlaws," generally perceived as a violent and lawless group, in order to inflame the jury. The dissent suggests that this was fair comment on the evidence because Henry admitted that he intended to hit Berry from the back in order to disable him. How does this invite an argument that Henry intended to make his reputation by killing Berry or justify a suggestion that Henry's social club is the same as the Outlaws? In my view, it does not.
In so far as McDonald v. State, 24 Fla. L. Weekly S347, ___ So.2d ___, 1999 WL 462608 (Fla. July 1, 1999), is concerned, the case merely reinforces the law recognized even by those who advocate new trials based on improper arguments that a new trial should not be required unless such argument caused the jury to return a verdict it might not have otherwise returned. The purpose of ordering a new trial is not to punish the offending lawyer; that is the role of the grievance procedure. A new trial should be ordered when failure to do so would constitute a miscarriage of justice.
GRIFFIN, J., dissenting.
The majority has given the defendant a new trial for "prejudicial prosecutorial excesses" during closing argument in reliance on Ruiz v. State, 24 Fla. L. Weekly S157, 743 So.2d 1 (Fla.1999). None of the prejudicial prosecutorial excesses identified was objected to by Mr. Henry's counsel nor were they mentioned in the motion for new trial.
I agree that certain of these comments were objectionable. It was unprofessional for the prosecutor to call the defendant's claim that the killing was an accident, "ridiculous" but it was not wrong to say why defendant's claim that the killing was an "accident" was utterly lacking in credibility. It was also wrong to refer to the defendant, who was being prosecuted for first-degree premeditated murder as a "cold blooded killer" but these words did not deprive appellant of a fair trial. Even less did the prosecutor's reference to the "Outlaws" gang "taint the judicial process." It was made abundantly clear throughout the case that the appellant was a member of the Night Riders, not the Outlaws. After referring to the Outlaws, the prosecutor corrected himself: "... he told his friend, his Outlaws'I'm sorry, Night Riders' brother ..." Even if this was not a mistake but a calculated misuse of words, it could not have been misleading to the jury.
As for the statement that Mr. Henry attacked the victim to establish his reputation with his new biker club, this is a fair comment on the evidence to explain Mr. Henry's conduct. Even Mr. Henry acknowledges he made a conscious decision to attack the victim from behind with the intent to disable him by striking him with the gun. Here is the prosecutor's statement in context:
Pat Tindell, who was the bar owner, who's [sic] probably seen a thousand drunks, probably just alone on Bike Week, she said this guy had too much. She cut him off. She told him to leave. He left and he went out back and started ranting and raving. But you know one thing that Pat Tindell said? "I shut him out. I tuned him out. He was *56 saying gibberish." And she's talking to Mr. Bagwell. Do you think if she was concerned for her safety she'd be standing right there next to this victim? Do you think if she was concerned for her safety that she would be facing away from him? She's just standing there talking.[1]
Six feet, two hundred and twenty pounds, the defendant. Mr. Bagwell, six two, two hundred plus pounds. Two big guys, by man's standard. Victim stipulated five ten, a hundred and ninety-five pounds. I mean, the choice used here was kill him.
On March the 12th, 1994, Mr. Henry established his reputation with his biker club. Butcher[2] is a killer. Think of the circumstances surrounding it. Who's at the bar? A Night Riders buddy. Some of them in the camp, some of them inside the bar. Music playing. Drinking. I'd say one patron getting out of hand, it would be expected.
The biggest impact in this case is the victim had nothing on him. There is no evidence of a weapon, there is no evidence of violence, other than being obnoxious and drunk. I submit to you that's not the standard for excusable homicide. You won't hear the judge say that if you find that the victim was obnoxious and drunk then the defendant is excused from killing him.
Unobjected to comments during closing argument have been the object of obsessive interest by Florida's district courts of appeal during the past several years, with some courts, including this one, adopting the prophylactic approach that new trials should be awarded as a remedy for improper comments in closing argument, even if the opposing attorney offered no objection. Florida's appellate courts appear to have been unique in their flirtation with this notion.[3] After years of experience with this concept, however, the wisdom of requiring objection as a predicate for reversible error became increasingly clear[4] and the wisdom of the supreme *57 court's limited exception only for unobjected to improprieties that rose to the level of a deprivation of due process[5] was increasingly appreciated. By now, all the district courts have either denied complicity in our prophylactic experiment, have issued mea culpas or have tacitly raised the bar of impropriety so high that the practical result is increasingly the same in all courts. What had become an almost routine point on appeal in virtually every criminal case and most civil cases had finally begun to subside.
Through all of these years, the Florida supreme court never participated in this self-flagellation but never interfered either. In cases too numerous to cite, the high court continued to observe that complaints about closing argument would not be recognized because there was no objection. See, e.g., Garcia v. State, 644 So.2d 59 (Fla.1994), cert. denied, 514 U.S. 1085, 115 S.Ct. 1799, 131 L.Ed.2d 726 (1995). Now, with Ruiz, at least as to the death penalty, we appear to have come full circle. Ruiz is still not final but it was unanimous and it is unlikely the outcome will change on rehearing. The high court has apparently decided to award new trials to defendants as a way of curbing prosecutorial excess in closing arguments, even if there was no objection. According to Ruiz, if any two judges find "inexcusable prosecutorial overkill,"[6] we are to order a new trial and report the prosecutor to the bar.
The opinion in Ruiz leaves many unanswered questions. In Ruiz, there were ostensibly some objections to the closing argument comments by defense counsel. According to the opinion:
When the properly preserved comments are combined with additional acts of prosecutorial overreaching set forth below, we find that the integrity of the judicial process has been compromised and the resulting convictions and sentences irreparably tainted.
Ruiz, 24 Fla. L. Weekly at S159, 743 So.2d at 7. Suppose there were no objections? Does that really matter? Suppose the objections that were made were correctly overruled? Is any sort of improper closing argument a basis for granting a new trial? If not, how many or what kind of comments equal an "irreparable taint"?
The high court in Ruiz, by pointedly not referring to its well-established prior case law applying a "deprivation of due process" standard to unpreserved error, appears to have set a standard in Ruiz that is less than the threshold it had heretofore applied to unpreserved error but it is unclear how it differs or why. Is this new standard subject to a harmless error analysis? If so, how? Even more startling, this new prophylactic approach to prosecutorial misconduct also requires a new trial when a prosecutor offers "improper" evidence without objection. Does this aggressive approach to prosecutorial misbehavior (or ignorance) apply equally to defense counsel? The shear breadth of this opinion and much of its language suggest it is intended by the court only to apply to the special concerns of a death penalty prosecution.[7]
The import of Ruiz is further clouded by the even more recent decision of McDonald v. State, 24 Fla. L. Weekly S347, ___ So.2d ___, 1999 WL 462608 (Fla. July 1, 1999). There, the court engaged in a classic analysis of the issue, defining fundamental error as "the type of error which `reaches down into the validity of the trial *58 itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Id. at S348, ___ So.2d at ___ (quoting Kilgore v. State, 688 So.2d 895, 898 (Fla.1996)). Pointing out that the jury was "well aware" of the facts of the case (and thus, presumably, were unlikely to be unduly affected by mere "argument"), the court concluded that the proceedings had not so "tainted" the jury's verdict as to require a retrial. About the only common thread between this opinion and Ruiz is the word "taint." In Ruiz, the court found a "taint" and in McDonald, they did not. With no further guidance, we seem to be left with attempting to measure the effect the prosecutor's statement has on the collective sensibilities of the reviewing court. All the more reason to limit Ruiz to death cases.
I would leave any unobjected to prosecutorial misconduct in a non-capital case that fails the Kilgore test to a 3.850 post-conviction remedy of ineffective assistance of trial counsel. Otherwise, depending on our sensibilities, or our trial experience, or the vast and largely inconsistent body of case law about what is, or is not, permissible closing argument,[8] we will simply wander aimlessly down this meandering path of "misconduct" until we get so lost that we finally turn home to the concept of preserved error.[9]
NOTES
[1] In my view, our emphasis should be less on the degree of egregiousness of counsel's conduct and more on whether such improper conduct, and not the evidence, caused the resulting verdict.
[2] See Rule 4-3.4 Fairness of Opposing Party and Counsel.

A lawyer shall not:
(e) [I]n trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justice of the cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused.
[1] The majority has described events from the perspective of the Night Riders' witnesses but Patricia Tindell, the putative object of Mr. Henry's protection, described events as follows:

This man was giving me some problems. Well, wasn't really giving me any problems in the bar, but he washe had been served a beer, and I walked by and I saw him bobbing his head and I took the beer away from him. So he never even got a beer out of my establishment. I asked him would he please leave, and then he got a little irate with me and he was saying, "I don't need this" and all this. And then he got a friend to get in on someon some problems with me. And I told him to leave. And finally after he didn't, I said, "It's time for you to go now." So maybe five minutesI don't know; I can't tell you the timehe walked out the back door and went back on the back porch.
* * *
He finally did leave and go out to the back porch. I was helping out the bartender that night. And I waited a few minutes before I went on the back porch. Because I saw him go out towards the back. When I went out towards the back, he washe was out there on the porch and he was still using some slander and kind of gripping at me. And so I went out there. And I don'tI don't remember whether Woody went right out with me or whether he waited a few minutes to come out to the porch.
* * *
I didn't feel really threatened. Iwith all the people around me, I wasn't, you know, really ...
* * *
And this guy was still standing there kind of arguing with me back and forth. And I wasn't really saying anything to him.
And all of a sudden this person comes up on the back porch, and I heard a pop, and the man fall [sic] down, and then walk [sic] off behind me.
After the killing, Henry fled, buried the gun in the woods and two days later, turned himself in to authorities.
[2] "Butcher," the defendant's nickname, ostensibly derived from one of his occupations.
[3] Larry A. Klein, Allowing Improper Argument of Counsel to be Raised for the First Time on Appeal as Fundamental Error: Are Florida Courts Throwing Out the Baby with the Bath Water?, 26 Fla. St. U.L.Rev. 97, 114 (1998).
[4] Id. at 99.
[5] See Kilgore v. State, 688 So.2d 895 (Fla. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 103, 139 L.Ed.2d 58 (1997); Ray v. State, 403 So.2d 956 (Fla.1981); Tyus v. Apalachicola N. RR., 130 So.2d 580 (Fla.1961).
[6] One of the most difficult problems is the extreme degree of disagreement among judges about what is objectionable in closing versus what is highly objectionable or fundamentally objectionable. Klein at 109-112.
[7] The high court in McDonald v. State specifically noted its particular concern about closing argument in death cases. 24 Fla. L. Weekly S347, 349, n. 9, ___ So.2d ___, ___, n. 9, 1999 WL 462608 (Fla. July 1, 1999).
[8] The last time I attempted to catalogue the various types of "improper" closing argument identified by the appellate courts of Florida, there were at least twenty-eight.
[9] The other alternative, of course, is simply to remove the concept of "argument" from "closing argument." To my mind, this is preferable to what we have now, which is a post hoc dissection of a written record of spoken words by three or more judicial officers wholly unable to gauge the context in which the words were spoken or the ears upon which they fell.