917 So.2d 226 (2005)
Barry JOHNSON, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D02-982.
District Court of Appeal of Florida, Third District.
December 7, 2005.
*227 Bennett H. Brummer, Public Defender, and John Eddy Morrison, Assistant Public Defender, for appellant.
Charles J. Crist, Jr., Attorney General and Erin Kinney, Assistant Attorney General, for appellee.
Before GERSTEN, RAMIREZ, and SHEPHERD, JJ.
Barry Johnson ("Johnson") appeals his judgment and convictions for armed robbery, burglary with assault, and attempted first degree murder with a firearm. We affirm.
Johnson entered a Discount Auto Parts store, approached the store clerk and asked for change. Once the clerk opened the register, Johnson pulled out his gun and demanded all of the money. The store's armed security guard observed Johnson holding up the store and approached Johnson with his gun drawn. Johnson exchanged shots with the guard and fled the store into a residential neighborhood. A teenager, who lived in the neighborhood, saw a man walk by his house holding a gun and enter a stopped get-away car at the end of the block.
The police arrived shortly after the robbery and located a blood trail in the parking lot. The blood trail began where the store clerks and security guard observed the robber flee and ended where the teenager saw the armed man enter the get-away car. The police collected the DNA evidence, which the crime lab later matched to Johnson's DNA. The two store clerks identified Johnson as the robber at the hospital, where he was being treated for a gunshot wound.
Markeisha Jackson ("Jackson"), also testified that Johnson propositioned her to accompany him to the hospital and lie about the circumstances surrounding his shooting. In exchange, Johnson offered to pay Jackson for her time. Jackson admitted on cross-examination that she was angry at Johnson because he never paid her. The jury found Johnson guilty on all counts. This appeal follows.
Johnson raises two issues on appeal. First, Johnson contends that the trial court erred by refusing to appoint him conflict-free counsel when the State called Jackson as a State witness. Defense counsel had previously represented Jackson on an unrelated matter. Second, Johnson contends that the prosecutor's comments during closing argument deprived him of a fair trial. We disagree on both issues.
The trial court did not err by refusing to allow defense counsel to withdraw due to a conflict of interest. In order to show that a Sixth Amendment violation has occurred, a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); Hunter v. State, 817 So.2d 786 (Fla.2002). Generally, conflict of interest issues arise when counsel dually represents two defendants on the same matter, or the witness being called is a victim in the case. Cuyler, 446 U.S. at 355 n. 3, 100 S.Ct. 1708; Rodriguez v. State, 767 So.2d 621 (Fla. 4th DCA 2000); Burnside v. State, 656 So.2d 241 (Fla. 5th DCA 1995). Here, defense counsel represented the witness, *228 Jackson for a probation violation on a completely unrelated manner, and Jackson was not a victim in this case.
Further, to show an actual conflict, a defendant must identify specific evidence in the record that suggests his interests were compromised. Hunter, 817 So.2d at 792. Here, counsel contends that a conflict existed because it was impossible to cross-examine Jackson effectively without implicating her as an accomplice and revealing confidential information. The record, however, reveals that defense counsel thoroughly cross-examined Jackson and did not reveal any confidential information. Accordingly, the defense failed to demonstrate that an actual conflict of interest existed. Martin v. State, 761 So.2d 475 (Fla. 4th DCA 2000).
Additionally, Johnson contends that the State's closing argument deprived Johnson of a fair trial. We disagree. All of the statements that Johnson contends were prejudicial error, including the unobjected-to comments, arose in the State's rebuttal closing argument. Viewing the comments in the context in which they were made, we deem the prosecutor's response as permissible comments on the evidence and a fair reply tailored to respond to the defense's closing argument. See Stancle v. State, 854 So.2d 228 (Fla. 4th DCA 2003); Mitchell v. State, 771 So.2d 596 (Fla. 3d DCA 2000); Vazquez v. State, 635 So.2d 1088 (Fla. 3d DCA 1994).
It is well established that counsel is afforded wide latitude in making arguments to the jury, especially in response to opposing counsel's improper comments. Schwarck v. State, 568 So.2d 1326 (Fla. 3d DCA 1990). Viewed in context of the entire closing, the prosecutor's comments, even if erroneous, were not a determining factor in the jury's determination of guilt. Doorbal v. State, 837 So.2d 940, 958 (Fla. 2003).
Simply put, none of the prosecutor's comments individually or collectively rise to the level of requiring a reversal. Accordingly, we affirm the trial court's decision.
Affirmed.
GERSTEN and SHEPHERD, JJ., concur.
RAMIREZ, J. (dissenting).
I respectfully dissent. While there is no dispute that a robbery took place on December 28, 2000, as the incident was captured on videotape, Barry Johnson's defense was mistaken identification and, unfortunately, the tape was not sufficiently clear to identify the robber. In this context, I believe the two issues raised on appeal have merit.

I. THE FACTS
Johnson's version of the events was that he had been shot by a stray bullet while the security guard was chasing down the actual robber. The bullet entered his left arm and lodged in his chest cavity. When he sought medical treatment, hospital personnel notified law enforcement, leading to Johnson's arrest.
At trial, the State called two store clerks, Amory Saunders and Kelvin Cruz, who had been told by the police that there was a black man at the hospital who had been shot. Saunders had described the robber as taller than 5'8" and wearing dark blue pants with no gold teeth. Johnson is 5'6" tall and has several gold teeth. The clothes Johnson was wearing did not match the description given by Saunders either. Saunders, nevertheless, identified Johnson as the robber. Additionally, Saunders had worked with a police artist to produce a sketch of the robber who did *229 not look anything like Johnson. Although the police artist testified to the contrary, Saunders insisted that the sketch was not finished. Cruz, the other store clerk, also described the robber as taller than himself. Cruz is 5'9" or 5'10", making the robber 5'11" or 6'0" tall.
The security guard, Gabriel Jimenez, could not identify Johnson as the robber. He exchanged gun fire with the robber inside the store and admitted that after he chased the robber out of the store, he fired a volley of four shots at the fleeing robber. There were also two ricochet marks on the front wall of the store, presumably from the shots the fleeing robber fired as he ran. The bullets hitting the store might have fragmented. The store was in a residential neighborhood. Jimenez did not think that he had shot the robber.
The State also called Xavier Crowder, a young boy who lived in the neighborhood, who testified that he saw a man dressed in green work clothes walking quickly and getting into a getaway car. The man had not been shot and carried a gun in his left hand before switching it to the right. Crowder did not identify Johnson as the robber.
Even though none of the witnesses thought that the robber had been shot, the police found a trail beginning about a half block from the store in the direction that the security guard fired. Through DNA testing, the blood found near the scene of the robbery was matched to Johnson's DNA profile.
At the end of the first day of testimony, the State decided to call to the stand Markeisha Jackson, a client of the Public Defender's office. Although the State had disclosed her to the defense and she had been deposed, the State subsequently led defense counsel to believe that she would not be testifying. The State admitted that it had not advised defense counsel of its intention to call Jackson to testify. Her name was not on the court file's witness list read to the venire during jury selection. During its opening statement, the State never alluded to her as a potential witness.
Jackson was on probation for battery on a law enforcement officer and resisting arrest with violence. The Public Defender's office was representing her at a probation violation hearing the same day that the robbery occurred. Defense counsel alerted the court to the problem before Jackson testified and noted that its other client, Johnson, was unwilling to waive the conflict. The trial court refused to appoint new counsel.
Jackson testified that she first saw Johnson with two other men at her brother's house. She claimed she knew one of the men from elementary school, but somehow could not remember his name. She got into a car with these three men because they offered her money to go with Johnson to the hospital. She testified that Johnson told her to provide the hospital with a different name and to say he had been wounded in a drive-by shooting in Opa-Locka. She never received any money, and she was mad and wanted revenge. Her testimony was an admission to being, at the very least, an accessory after the fact, and therefore, guilty of a second degree felony, but defense counsel never questioned her about any formal or informal agreement with the State Attorney's office to forego prosecution. Although Jackson claimed that she did not want to testify, defense counsel never asked her about her motivation to testify.
The State was able to make a rebuttal closing argument which was fraught with improprieties. The prosecutor began by describing Johnson's reasonable doubt defense as "you throw something, throw a *230 bowl of spaghetti, against the wall, and see if it sticks." He continued by telling the jury that some of defense counsel's arguments "were made in jest, okay, and you should just get those things out of the way." He then noted that: "I understand the defense's job to come up here and just rattle down the State's case. But it's my job to settle everybody down, and say, let's focus." The trial court overruled the defense objection.
The prosecutor then proceeded to "focus" the jury by characterizing the defense as: "Now, the witnesses are so fearful, oh my, they just turn, and they just lost the ability to see. That's what she [defense counsel] wants you to think." The prosecutor's idea of "focus" was to rebut a defense argument that had never been made, and create a straw-man defense: "The defense always says, Amory was in the back of the store, and Cruz in the front of the store." The trial court overruled defense counsel's objection. The defense had never made such a claim because, as the prosecutor well knew, the whole incident was videotaped, as he was quick to point out sarcastically: "We saw it on the videotape. Okay. But, okay, that didn't happen there. Okay. It didn't happen, come on." Johnson's defense was misidentification. He never disputed the facts of the robbery nor suggested that Amory Saunders was in the back of the store away from the cash register.
The prosecutor continued to ridicule the defense: "This is a major crime lab, folks. Okay. They are not out there with the little red wagon. They have a big truck, okay." Seconds later, the State told the jury that it had other witnesses it choose not to call: "Thirteen witnesses showed up for trial. Pared down for trial. But we know, just listening to what the testimony was, that there were many, many, many more people." The prosecutor proceeded to interject his opinion on his witness, Amory Saunders: "And then we get to, at the end, Amory Saunders, okay, he believes that the defendant is the robber. He is not a bad guy. Yes, okay, I have been sitting here with him the last two or three days. Okay. He is not a bad man."
A few lines later, the ridicule continued: "Okay. But, you know, the defense wants you to believe something else, fool, you know, looked at the mirrors, no mirrors. Okay."
The only objection that the trial court sustained (twice) was when the prosecutor attempted to testify as to what the detectives' jobs were. However, it did not take him long to return to sarcasm: "Don't the people in the store say that's the guy that robbed him. And golly gee, he got shot and he showed up at a hospital. Boy I guess [Detective] Hladky just dropped the ball and screwed up. Boy, more problems." The prosecutor also suggested that defense counsel was playing games: "And yes, I will play like Ms. Levenstein is playing this game here." The trial court overruled the defense objection.
After accusing the defense of calling Detective Hladky "a blithering idiot, who can't get his act together," the prosecutor stated: "Oh, this is a good one. Okay. There's no DNA on the money. Now, you guys got to latch onto that. Gosh. We did all the other things, but we didn't test for that. Now, you see any blood on the cash. Hey, anyone, is there any blood on the cash. Okay." The prosecutor continued: "I don't keep a money tree in my back yard, I haven't found any back there yet. I keep looking for it, I haven't found that tree, I haven't found it. I don't have printing press in my house to make fresh money either. I don't."
The assistant State attorney then made the following argument (naming State witnesses):

*231 Listen to me, reasonable doubt is not throwing that bowl of spaghetti against the wall and hoping something sticks. That's not reasonable doubt, folks. Don't get stuck on that.
Reasonable doubt is not something that you make in front of everybody, like a blithering idiot, so everybody down the line is an idiot.
Okay. Even the little boy. That little boy has to live in that neighborhood. Okay. You think that little boy could come here and point somebody out.
Okay. He has to live there. So, Amory Saunders is an idiot, Kelvin Cruz is an idiot, Gabriel Jimenez is an idiot.
Okay. And George Green is an idiot. Mr. Chavez is an idiot. Sergeant McManus, who found the little boy and found the blood trail, is an idiot.
Mr. Xavier Crowder, the little 13-year-old boy who has courage to come in here and testify, and he lives there, and he showed you his house in the photograph.
Okay. He is an idiot, too. Right. Detective Mike Coward is an idiot, because he was doing his job.
Mrs. Jackson is an idiot. Mrs. Yvonne Jackson is an idiot, both Markeisha and Yvonne, because guess what, they just happen to be found, and they lived in the area. Okay. And Officer Gruendel, I guess he is an idiot. He was doing his job as a Deputy Sheriff. And Detective Bill Hladky, he is an idiot, too, because he is the lead guy, that didn't do all this stuff.
Then she says, wait a minute, he did something, he went out, he got the blood, he discussed the GSR, he looked into these things. And Sharon Hinz, the DNA person. She must be an idiot, too. Everybody is an idiot, everybody has it all wrong.
No, the person who has it all wrong is Mr. Johnson. Okay.
The prosecutor concluded by speculating as to what the young boy, Xavier Crowder, would have testified to if he had not been scared: "Now, do you know him, Mr. Crowder. Yes. Okay. How long [have] you lived there. Thirteen years. Yes, he is scared. Okay. He has to live there." Crowder testified that he got scared when he saw the robber walking by with the gun and that he hid behind a mango tree. He never said that he was scared to testify. He also said he had lived in the area for only two years and that the robber was not one of his neighbors.
The jury deliberated for almost four hours before returning guilty verdicts on all counts. Johnson was sentenced to life in prison.

II. CLOSING ARGUMENT
The prosecutor's rebuttal closing argument could be used to teach a course on improper arguments. He improperly 1) vouched for State witnesses; 2) denigrated defense counsel; 3) ridiculed Johnson's defense; 4) put forth a straw-man defense never argued by Johnson; and 5) shifted the burden to Johnson by stating that to find reasonable doubt, the jury must believe all the State's witnesses were "idiots," and 6) referred to information not in evidence, including suggesting that the State had other witnesses and that one of the State's witnesses had been threatened not to identify Johnson as the robber  all done within a fifteen-minute rebuttal argument.
We first look at the State's argument that the defense did not object to each and every improper argument that the prosecutor made. The trial court overruled four defense objections in the course of the prosecutor's brief argument and sustained *232 only one objection. In a unanimous en banc decision this Court stated:
The State argues that because defendant did not object to all of the objectionable comments, the issue has not been properly preserved for appellate review. Although the preserved errors in closing, alone, may seem insufficient to require reversal, we conclude that the Florida Supreme Court's decision in Ruiz v. State, 743 So.2d 1 (Fla.1999), allows review of all comments made by the prosecutor during summation.
Lewis v. State, 780 So.2d 125, 128 (Fla. 3d DCA 2001).
The Florida Supreme Court stated in Ruiz: "When the properly preserved comments are combined with additional acts of prosecutorial overreaching set forth below, we find that the integrity of the judicial process has been compromised and the resulting convictions and sentences irreparably tainted." Ruiz, 743 So.2d at 7. See also Card v. State, 803 So.2d 613, 622 (Fla.2001)("We do not examine allegedly improper comments in isolation. Rather, the Court examines the totality of the errors in the closing argument....").
The prosecutor vouched for the robbery victim, Amory Saunders, saying that "he believes that the defendant is the robber. He is not a bad guy." Vouching for and bolstering the testimony of a victim is improper. See, e.g., Lewis v. State, 711 So.2d 205, 207 (Fla. 3d DCA 1998). The State seeks to excuse this error by arguing that defense counsel also stated that Saunders and Cruz were not bad people. While it is proper for the defense to call the prosecution witnesses good people, it is not proper for the State to do so. The defense is not vouching for its own witnesses. The State is. The argument that this was "fair response" according to Pitts v. State, 307 So.2d 473, 482 (Fla. 1st DCA 1975), is inapposite because the State was agreeing with, rather that responding to the defense's statement.
Comments denigrating defense counsel included "the defense's job is to come up here and just rattle down the State's case," suggesting that defense counsel was trying to "fool" the jury, and accusing defense counsel of "playing this game here." The prosecutor also peppered his argument with other attacks by referring to defense counsel's own arguments as "made in jest," and the crime lab arriving in their "little red wagon," and references to a "money tree." He also used sarcasm through frequent uses of "oh my,", "golly gee,", "gosh," and "Hey, anyone, is there any blood on the cash?" Most egregious was the twice-repeated reference to the reasonable doubt defense as "throwing that bowl of spaghetti against the wall and hoping something sticks." The prosecutor's final closing substituted sarcasm, cynicism and ridicule for legal argument. Such arguments are clearly improper. See Riley v. State, 560 So.2d 279, 280 (Fla. 3d DCA 1990)("A prosecutor may not ridicule a defendant or his theory of defense...."); Lewis, 711 So.2d at 207 (finding it improper for the prosecutor to attack the defense as "just lame"); Baker v. State, 705 So.2d 139 (Fla. 3d DCA 1998) ("[C]omments implying that the defense counsel was fishing for gullible jurors were completely improper."); Alvarez v. State, 574 So.2d 1119, 1120 (Fla. 3d DCA 1991) (comments such as: "Don't let them [defense counsel] confuse you, because all you will get from the defense is tearing down. You will not get anything substantive, only inconsistencies..." held inappropriate); Jackson v. State, 421 So.2d 15, 15 (Fla. 3d DCA 1982) ("The prosecutor's personal attacks upon defense counsel during final argument  which reached their apogee (or nadir) when the jurors were asked whether they would buy a used car from him  were, as is now *233 acknowledged by the State, utterly and grossly improper."); Henry v. State, 743 So.2d 52, 53 (Fla. 5th DCA 1999) (labeling a defense the "most ridiculous defense" the prosecutor had ever heard held inappropriate); Izquierdo v. State, 724 So.2d 124, 125 (Fla. 3d DCA 1998) (calling the defense a "pathetic fantasy" was inappropriate); Rosso v. State, 505 So.2d 611 (Fla. 3d DCA 1987) (holding that denigrating insanity defense was inappropriate). These cases demonstrate that appellate courts have consistently not allowed the prosecution to denigrate the defense with such pejorative comments.
Additionally, the trial court allowed the State to argue that the defense's job was to disconcert or fluster the State's case, to fool the jury and to play games. The objection to the "rattle down" argument was overruled. The trial court thus placed its seal of approval on this argument.
The prosecutor also created a straw-man defense, which he then knocked down (with the usual sarcasm) by pointing to the videotape from the security camera: "But we know by the video we showed you, they were in the same place. Guess what, folks. The video is here. But the defense always says Amory was in the back of the store and Cruz in the front of the store." The prosecution followed up with a second comment of a similar nature: "We saw it on the videotape. Okay. But, okay, that didn't happen there. Okay. It didn't happen, come on." The defense never disputed that Amory Saunders was at the cash register or the details of the crime, only the identification. Setting up straw-man defenses only to demolish them is improper. See Morgan v. State, 700 So.2d 29, 30 (Fla. 2d DCA 1997) ("The prosecutor's creation of a `straw man' alibi was clear error."); Lane v. State, 459 So.2d 1145, 1146 (Fla. 3d DCA 1984).
The prosecutor also shifted the burden of proof by asserting: "Reasonable doubt is not something that you make in front of everybody, like a blithering idiot, so everybody down the line is an idiot." He then proceeded to name each and every State witness in the case, asserting that for there to be reasonable doubt, every witness had to be an "idiot." This argument seems even more egregious than the more commonly reported prosecutorial statement that for there to be reasonable doubt, one or more State witnesses must be lying. Such comments improperly shift the burden of proof. See, e.g., Gore v. State, 719 So.2d 1197, 1200-01 (Fla.1998); Clewis v. State, 605 So.2d 974, 975 (Fla. 3d DCA 1992). By requiring Johnson to prove that the witnesses were "idiots," the State created a more difficult standard to show reasonable doubt. See also Eure v. State, 764 So.2d 798, 800 (Fla. 2d DCA 2000).
Finally, the prosecutor argued facts not in evidence. The prosecutor told the jury that he had "many, many, many" more witnesses that he did not present at trial. Such an argument is clearly improper. See, e.g., Hazelwood v. State, 658 So.2d 1241, 1244 (Fla. 4th DCA 1995) ("This court has repeatedly held that a prosecutor cannot suggest during closing argument that there are other witnesses who would corroborate the State's case had they been called to testify."). He also suggested, with no basis in evidence, that Crowder, the young boy in the neighborhood, had been threatened to keep him from identifying Johnson as the robber: "That little boy has to live in that neighborhood. Okay. You think that little boy could come here and point somebody out." Effectively, the last comment the prosecutor made to the jury referred to Crowder being scared. "A suggestion that the defendant suborned perjury or that a defense witness manufactured evidence, *234 without foundation in the record, is completely improper." Cooper v. State, 712 So.2d 1216, 1217 (Fla. 3d DCA 1998); see also Tran v. State, 655 So.2d 141 (Fla. 4th DCA 1995); Henry v. State, 651 So.2d 1267, 1268-69 (Fla. 4th DCA 1995).
Although wide latitude is permitted in closing argument, see Breedlove v. State, 413 So.2d 1, 8 (Fla.1982), this latitude does not extend to allow improper argument. Gore, 719 So.2d at 1200. The State's rebuttal argument was not long. It takes up less than twelve full printed pages. When viewed in context, the prosecutor's closing was more of a diatribe than an argument, brimming with sarcasm, cynicism and ridicule. With no opportunity for rebuttal, the prosecutor's final closing degraded the trial into what has become a form of popular entertainment  condescending, rude, personal attacks said in a way that is supposed to be entertaining or funny. For the trial court to allow such tactics makes a mockery of justice. See Gomez v. State, 751 So.2d 630 (Fla. 3d DCA 1999) (sixteen separate improper comments); Henry, 743 So.2d at 52 (four different improper comments); Freeman v. State, 717 So.2d 105, 106 (Fla. 5th DCA 1998) (three different improper comments contributed to the "cumulative effect of the prosecutorial misconduct in this case"); Ryan v. State, 457 So.2d 1084 (Fla. 4th DCA 1984) (five different categories of improper comments).
Furthermore, this prosecutorial misconduct cannot be considered harmless. The State's eyewitnesses had been impeached with their prior descriptions of the robber. The sketch the Amory Saunders produced with the police artist, whether finished or not, does not look like Johnson. The jury deliberated for almost four hours before reaching a verdict. There exists more than a "reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).

III. THE RIGHT TO CONFLICT-FREE COUNSEL
The State's decision halfway through trial to call Markeisha Jackson created a conflict of interest for Johnson's defense counsel. Jackson was a former client of the Public Defender and had taken a position directly adverse to Johnson. She admitted as much when she stated that she wanted revenge against Johnson. Through her own testimony, Jackson implicated herself in assisting the perpetrator of an armed robbery to obtain medical treatment for a gunshot wound sustained during the incident. Any effective cross-examination of Jackson should have included whether the State intended to prosecute her based on her involvement in the incident, and whether she had been promised leniency in exchange for her testimony. Yet, for defense counsel to have done so would have been to suggest a course of action adverse to its other client. Additionally, loyalty to Johnson required defense counsel to look at her own files on Jackson; while loyalty to Jackson required that defense counsel refrain from doing so.
The trial court recognized the conflict and initially offered to have a different assistant public defender cross-examine Jackson. After defense counsel pointed out that all assistant public defenders would have the same conflict of interest, the trial court then blamed defense counsel for raising this issue mid-trial. After learning that the State had not disclosed that Jackson would be testifying, the trial court ordered defense counsel "to create a wall between you and the [non-public case] file" on Jackson. The State has failed to cite a single case approving such a procedure. Instead they cite Hunter v. State, 770 So.2d 232 (Fla. 4th DCA 2000), a case denying certiorari review of an order finding no actual conflict with Public Defender's *235 representation where the State had no intention of calling the prior client as a witness. In Smith v. White, 815 F.2d 1401, 1406 (11th Cir.1987), the court denied habeas corpus relief where the defendant had merely raised a "speculative possibility of conflict." Here, the trial court evidently recognized the existence of a conflict when it ordered defense counsel not to look in its own file concerning her recent representation of a key State witness.
"Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interests." Wood v. Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). "An attorney who cross-examines a former client inherently encounters divided loyalties." Nixon v. Siegel, 626 So.2d 1024, 1025 (Fla. 3d DCA 1993) (quoting Lightbourne v. Dugger, 829 F.2d 1012, 1023 (11th Cir.1987)). Additionally, the public defender was understandably reticent to cross-examine Jackson on her criminal liability in this case and the State's lack of prosecution for her involvement. Implicating a former client in a crime results in a conflict of interest. See Stoudimire v. State, 760 So.2d 985 (Fla. 5th DCA 2000).
We sympathize with the trial court's frustration when it was confronted with this conflict in the middle of trial, but we disagree with the solution. If we approved this solution, any conflict, no matter how blatant, could be resolved with a similarly artificial remedy.
The standards of appellate review on this issue are quite rigorous. Once there is a conflict of interest, "prejudice is presumed regardless of whether it was independently shown." Holloway v. Arkansas, 435 U.S. 475, 489, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Likewise, this error is not subject to harmless error analysis. Id. at 490-91, 98 S.Ct. 1173; Lee v. State, 690 So.2d 664, 668 (Fla. 1st DCA 1997) ("The reason appellate courts have declined to apply the harmless error rule to cases in which a defendant was deprived of the right to conflict-free counsel is that any action the lawyer refrained from taking because of the conflict would not be apparent from the record.").

IV. CONCLUSION
The trial court erred in not appointing conflict-free counsel to represent Johnson and in allowing the prosecutor's final closing argument to go unchecked. Therefore, this Court should reverse Johnson's convictions and sentence and remand for a new trial and appointment of conflict-free counsel.