743 So.2d 1 (1999)
Walter RUIZ, Appellant,
v.
STATE of Florida, Appellee.
No. 89,201.
Supreme Court of Florida.
April 1, 1999.
Rehearing Denied May 12, 1999.
*2 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Walter Ruiz. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse the conviction and vacate the sentence because of prosecutorial misconduct.
Between 7 and 8 p.m. on April 7, 1995, Rolando Landrian was abducted from a Stop and Shop convenience store parking lot in Tampa and shot to death. Walter Ruiz was arrested in June and charged with first-degree murder, armed kidnapping with a firearm, and robbery with a firearm. Evidence adduced at trial showed the following: Landrian was the *3 former common law husband of Lotia Romanes; after the couple broke up, Lotia and her subsequent husband, Delio, worked for and at times lived with Landrian; Lotia and Delio lived in Tampa and on occasion bought drugs from Ruiz who lived in Orlando; Lotia and Delio ultimately bailed Ruiz out of jail on an unrelated robbery charge and solicited him and a second person, Micky Hammonds, to "rough up" or kill Landrian because Landrian had raped Lotia's two daughters by a different marriage.
Hammonds entered a plea and testified for the State.[1] He attested to the murder-for-hire plot and explained that on the day of the murder he and Ruiz followed Landrian throughout Tampa but were unable to accost him until that evening. Hammonds testified that after they kidnapped Landrian at the Stop and Shop he drove the getaway car while Ruiz held a gun on Landrian. When Hammonds stopped the car, Ruiz and Landrian got out and Ruiz shot Landrian. The State presented several witnesses who testified that they saw Ruiz on the day of the murder outside Landrian's house and at the Stop and Shop.
Ruiz presented an alibi defense, claiming that he was in Orlando on the day of the murder. Several witnesses attested to this. Ruiz claimed that while the Romanes had solicited him to rough up Landrian, he turned the offer down. Delio, he claimed, was the real killer, and Hammonds was being paid to implicate Ruiz.
Ruiz was convicted as charged and the court followed the jury's ten-to-two recommendation and imposed a sentence of death on the first-degree murder count based on four aggravating circumstances,[2] no statutory mitigating circumstances, and several nonstatutory mitigating circumstances.[3] The court imposed concurrent life sentences on the remaining counts. Ruiz raises five issues on appeal.[4]
*4 As his first two points, Ruiz contends that the prosecutors engaged in egregious misconduct during closing argument in both the guilt and penalty phases of the trial. We agree. A criminal trial is a neutral arena wherein both sides place evidence for the jury's consideration; the role of counsel in closing argument is to assist the jury in analyzing that evidence, not to obscure the jury's view with personal opinion, emotion, and nonrecord evidence:
A criminal trial provides a neutral arena for the presentation of evidence upon which alone the jury must base its determination of a defendant's innocence or guilt. Attorneys for both sides, following rules of evidence and procedure designed to protect the neutrality and fairness of the trial, must stage their versions of the truth within that arena. That which has gone before cannot be considered by the jury except to the extent it can be properly presented at the trial and those things that cannot properly be presented must not be considered at all.
The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence. It is not for the purpose of permitting counsel to `testify' as an `expert witness.' The assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence." United States v. Morris, 568 F.2d 396, 401 (5th Cir.1978) (emphasis in original). To the extent an attorney's closing argument ranges beyond these boundaries it is improper. Except to the extent he bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses. Furthermore, he may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty.
It is particularly improper, even pernicious, for the prosecutor to seek to invoke his personal status as the government's attorney or the sanction of the government itself as a basis for conviction of a criminal defendant.
The power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says. That same power and force allow him, with a minimum of words, to impress on the jury that the government's vast investigatory network, apart from the orderly machinery of the trial, knows that the accused is guilty or has non-judicially reached conclusions on relevant facts which tend to show he is guilty.

Hall v. United States, [419 F.2d 582, 583-84 (5th Cir.1969)].
United States v. Garza, 608 F.2d 659, 662-62 (5th Cir.1979) (citations and footnote omitted).
The present case was a hotly contested credibility battle with conflicting evidence and witnesses. As noted above, the State contended that Ruiz was a hit-man for the Romanes and that he executed Landrian. Hammonds, the driver during the alleged kidnapping and murder, testified at length concerning this. Mary Jo Hahn, a neighbor of Landrian's, stated that she saw Ruiz in the passenger seat of a car parked outside Landrian's house on April 7, and Stop and Shop employee Charles Via and manager Michael Witty both identified Ruiz as the man they saw accosting Landrian.
The defense, on the other hand, claimed that Ruiz was elsewhere on the day of the murder. Ruiz himself testified that he was in Orlando with his mother running errands and shopping at K-Mart and that later that evening he met with his ex-wife at her home and played with his children. Both his mother and ex-wife attested to this, and several eyewitness reported seeing him with his ex-wife that night. Inmate Alderman testified that Hammonds told him in prison that whereas he, Hammonds, *5 was blaming the murder on Ruiz, it actually was the stepfather of the raped daughters, i.e. Delio Romanes, who committed the murder.
The witnesses for both sides were subjected to extensive cross-examination and impeachment, and the credibility of each was called into question. At the zenith of this fray, during closing argument in the guilt phase, prosecutor Cox sought to bolster the credibility of the State's case with the following improper statements:
[MS. COX:] What interest, ask yourselves what interest does [State witness] Charles Via, Michael Witty, the Hahns, Dianne Guty and Abraham Machado have in seeing that somebody other than the person responsible for this horrible crime be convicted? What interest do we as representatives of the citizens of this county have in convicting somebody other than the person
MR. DONERLY: Objection, Your Honor.
THE COURT: Yeah, sustained.
MR. DONERLY: Move for a mistrial.
THE COURT: Denied.
MS. COX: Delio Romanes was charged in this case. What interest is there to bamboozle anybody about Delio's real role in this case. Ask yourselves that. No one is saying Delio Romanes has clean hands, but what interest does anybody have in saying that Delio Romanes isn't the person responsible for this if he was?
By arguing that the prosecutors as representatives of the State have no interest in convicting anyone other than the guilty ("What interest do we [prosecutors] as representatives of the citizens of this county have in convicting somebody other than the person."), prosecutor Cox was implying, "If the defendant wasn't guilty, he wouldn't be here." This type of argument has been soundly rejected by courts. In finding the statement "we try to prosecute only the guilty" indefensible, the court in Hall v. United States, 419 F.2d 582 (5th Cir.1969), explained:
This statement takes guilt as a predetermined fact. The remark is, at the least, an effort to lead the jury to believe that the whole governmental establishment had already determined appellant to be guilty on evidence not before them. Or, arguably it may be construed to mean that as a pretrial administrative matter the defendant has been found guilty as charged else he would not have been prosecuted, and that the administrative level determination is either binding upon the jury or else highly persuasive to it. Appellant's trial was held and the jury impaneled to pass on his guilt or innocence, and he was clothed in the presumption of innocence. The prosecutor may neither dispense with the presumption of innocence nor denigrate the function of the trial not sit as a thirteenth juror.
Id. at 587 (citation and footnote omitted).
The State engaged in a second line of improper comment in closing argument in the guilt phase when prosecutor Goudie compared the defendant to Pinocchio:
It's the evidence in this case that you're to look at and you look at it and you say, look at this stuff. Is this enough to give me an abiding conviction of guilt? I can't even think of a way that it isn't enough to give you an abiding conviction of guilt, an overwhelming conviction of guilt. There's no way, no stretch of the imagination because let me tell you one thing, if that guy were Pinocchio, his nose would be so big none of us would be able to fit in this courtroom on what he said [up] there.

You all had an opportunity to watch him. Give me a break, okay? Look to the evidence, think about it. Use your common sense, and don't let anybody get you side-tracked, and all of you are going to come back with the only just verdict you can in this case, and remember that [what] you're here to do is render justice. Truth equals justice, *6 and the truth is he was the hit man. He violently kidnapped, robbed and murdered another human being and after he did that, and you saw those pictures, and how, frankly, how gross they were. After he did that, he had a burger and fries at a Burger King. That's the kind of person we're looking at over there. That's what he thought about another human being. The truth is he did that and justice is that you convict him of it.
Thank you.
The State contends that this Pinocchio argument is permissible under Craig v. State, 510 So.2d 857 (Fla. 1987), wherein this Court stated:
Appellant argues that the prosecutor improperly made repeated references to defendant's testimony as being untruthful and to the defendant himself as a "liar." It may be true that the prosecutor used language that was somewhat intemperate but we do not believe he exceeded the bounds of proper argument in view of the evidence. When counsel refers to a witness or a defendant as being a "liar," and it is understood from the context that the charge is made with reference to testimony given by the person thus characterized, the prosecutor is merely submitting to the jury a conclusion that he is arguing can be drawn from the evidence. It was for the jury to decide what evidence and testimony was worthy of belief and the prosecutor was merely submitting his view of the evidence to them for consideration. There was no impropriety.
Id. at 865. We disagree.
Prosecutor Goudie's comments cross the line of acceptable advocacy by a wide margin. By characterizing Ruiz as "Pinocchio" and then telling the jury that "truth equals justice" and "justice is that you convict him," the prosecutor was inviting the jury to convict Ruiz of first-degree murder because he is a liar. Cf. Bass v. State, 547 So.2d 680, 682 (Fla. 1st DCA 1989) ("In our view, with this exhortation, taken in the context of his earlier unsupported remarks, the prosecutor extended an open invitation to the jury to convict the defendant for a reason other than his guilt of the crimes charged. Such comments have been held to constitute reversible error in a long line of cases.").
The State engaged in a third line of improper comment during closing argument in the penalty phase. Prosecutor Cox urged the jurors to do their duty as citizens just as her own father had done his duty for his country in Operation Desert Storm:
Ask Mr. Ruiz why should their love be a reflection upon him when it had no effect on him or his behavior, none. Doesn't his reckless indifference to their love, to their well-being, to their concern make his action even more despicable?
And it's not easy for any of us to be here. My father was a physician and commander in the United States Military, U.S. Navy Reserve, and about six years ago, he got orders to go to Operation Desert Storm to command a Naval ship in the Gulf. And as he prepared to close his practice down and leave, they found a shadow on his brain, and the doctors would not commit to anything, but we all knew, the family all knew that that was going to be the cancer that ultimately killed him.

And so I begged him, don't go, your days are numbered. Stay here with your family. Go talk to the people who issued your orders, go talk to the Navy and tell them that you can't go. You've got an excuse now. You've got an excuse that no one can deny. And he said, "I can't do that. This is my duty." And the thing about duty is that it's often difficult and it's usually unpleasant, but it's a moral and in this case a legal obligation.
When you got your duty summons in this case, it was a call to duty, and no one of us is underestimating the difficulty of your task in this case, but it's your *7 duty to make sure that justice is meted out in this case.

It's without any pleasure that the State asks for the ultimate sentence because for there to be justice in our society, the punishment must fit the crime, the crime that was inflicted upon Rolando Landrian, the ultimate act of moral depravity and unmitigated evil. And justice can be harsh and demanding, but there's no room in these facts for compassion. There's no room in these facts for mercy.
We ask you to consider this not because it's easy, because we all know it's very difficult, but it's the right thing and we ask that you have the courage and the moral strength to bring justice to this case.
Thank you.
This blatant appeal to jurors' emotions was improper for a number of reasons: it personalized the prosecutor in the eyes of the jury and gained sympathy for the prosecutor and her family; it contrasted the defendant (who at that point had been convicted of murder) unfavorably with Ms. Cox's heroic and dutiful father; it put before the jury new evidence highly favorable to the prosecutor; it exempted this new evidence from admissibility requirements and from the crucible of cross-examination; and most important, it equated Ms. Cox's father's noble sacrifice for his country with the jury's moral duty to sentence Ruiz to death.
The State argues that because defense counsel failed to object to several of the prosecutor's guilt and penalty phase statements he is barred from raising this issue on appeal. We disagree. When the properly preserved comments are combined with additional acts of prosecutorial overreaching set forth below, we find that the integrity of the judicial process has been compromised and the resulting convictions and sentences irreparably tainted.
As noted above, Ruiz was in jail in Seminole County on an unrelated robbery charge when the Romanes posted bond for him and solicited his services in executing or "roughing up" Landrian. Ruiz now contends that the State improperly elicited testimony showing that the crime he was charged with in Seminole County was a robbery.[5] We agree. As we *8 have pointed out, "[t]he State is not permitted to present otherwise inadmissible information regarding a defendant's criminal history under the guise of witness impeachment." Geralds v. State, 601 So.2d 1157, 1162-63 (Fla.1992). The fact that Ruiz was charged with an unrelated robbery in Seminole County was collateral to the issue of guilt on the murder count, and the State thus was required to "take" Ruiz's answers on cross-examination.[6] Contrary to the State's argument, the prosecutor's persistent baiting of Ruiz did not "open the door" to that line of inquiry.[7] Admission of this evidence was error.
Ruiz next claims that the State improperly introduced into evidence an inflammatory photo of the corpse. We agree. Admission of photographic evidence of a murder victim is within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent abuse. Gudinas v. State, 693 So.2d 953 (Fla.1997). Further, the test for admissibility of such a photo is relevancy, not necessity. Pope v. State, 679 So.2d 710 (Fla.1996). The photo in issue is a two-by-three foot blow-up of the victim's upper bodyit revealed in detail the bloody and disfigured head and upper torsowhich the State introduced during the penalty phase. The record shows that the prosecutor provided no relevant basis for submitting the blow-up at that point in the trial; the standard-size photo from which the blow-up was made had already been shown to the jury during the guilt phase. Appellate counsel for the State likewise offered no credible explanation at oral argument before this Court. We must conclude that the photo was offered simply to inflame the jury. This was error.
Ruiz argues as his last point that the prosecutor improperly introduced testimony showing that police found a bloody gun in Ruiz's apartment following his arrest on a prior charge of resisting arrest with violence in connection with a domestic disturbance. We agree. Evidence concerning the circumstances of a prior violent felony conviction may be admissible in a capital sentencing proceeding where admission of the evidence does not violate the defendant's confrontation rights and where the probative value of the evidence is not outweighed by its prejudicial effect. Finney v. State, 660 So.2d 674 (Fla.1995). Of course, as with all evidence, in order to be admissible the proof must meet the test of relevance. Id. The present record reveals no relevant basis for introducing testimony concerning the gun. The gun was unrelated to the domestic disturbanceit was found in the bedroom of a different apartment in a different buildingand played no role whatsoever in the resulting arrest. Again, we must conclude that this evidence was introduced simply to inflame. This was error.
In conclusion, the present record shows that this trial was permeated by egregious and inexcusable prosecutorial misconduct. Prosecutors Cox and Goudie attempted to tilt the playing field and obtain a conviction *9 and death sentence in a number of improper ways: by invoking the immense power, prestige, and resources of the State (i.e., "What interest do we [prosecutors] as representatives of the citizens of this county have in convicting somebody other than the person."); by demeaning and ridiculing the defendant (i.e., "if that guy were Pinocchio, his nose would be so big none of us would be able to fit in this courtroom"); by characterizing the defendant as the archetypical liar and then equating truth with justice and justice with a conviction (i.e., "[t]ruth equals justice" and "justice is that you convict him"); by appealing to the jurors' raw emotions (i.e., recounting the anecdote concerning prosecutor Cox's cancer-stricken father); and by introducing improper evidence (i.e., the blown-up photo of the bloody head; testimony concerning the unrelated robbery charge; and testimony concerning the unrelated gun).
We warned of the dire consequences of such "inexcusable prosecutorial overkill" in Hill v. State, 477 So.2d 553 (Fla. 1985):
Appellant has also alleged several instances of improper prosecutorial comment during the trial. We find the prosecutor acted improperly by asking the jury to consider him a "thirteenth juror" when it retired to deliberate its verdict in the guilt phase, but find the error harmless under the circumstances of this cause. Had the case involved substantial factual disputes, this "inexcusable prosecutorial overkill" would have resulted in harmful error requiring reversal of each of appellant's convictions. We again caution prosecutors to note that repeated failure to curb this misconduct adds fuel to the flame of those who advocate the adoption of a per se rule of reversal for such misconduct.
Id. at 556-57 (citations omitted). The present case is precisely the scenario we feared in Hilla bitterly contested swearing match between competing witnesses, including eyewitnesses on both sides, where a defendant's life hangs in the balance.
In spite of our admonishment in Hill and despite subsequent warnings that prosecutorial misconduct will be subject to disciplinary proceedings of The Florida Bar,[8] we nevertheless continue to encounter this problem with unacceptable frequency.[9] The present case follows on the heels of another misconduct case[10] and is one of the worst examples we have encountered. The conduct of prosecutors Cox and Goudie was both egregious and inexcusable. The prosecutors crossed the line of zealous advocacy by a wide margin and *10 compromised the integrity of the proceeding.
Accordingly, we must reverse Ruiz's convictions, vacate his sentences, and remand for a new trial.[11] We submit this matter, via issuance of this opinion, to The Florida Bar to determine whether any disciplinary rules were violated.
It is so ordered.
HARDING, C.J., SHAW, WELLS, ANSTEAD and PARIENTE, JJ., and OVERTON and KOGAN, Senior Justices, concur.
NOTES
[1] Hammonds was sentenced to twenty years' imprisonment for his role in the crime.
[2] The court found that the State had proven the existence of the following aggravators: (1) Ruiz had been convicted of a prior violent felony (i.e., resisting arrest and three separate armed robberies); (2) the murder was committed in the course of a kidnapping; (3) the murder was committed for financial gain; and (4) the murder was committed in a cold, calculated, and premeditated manner. The court concluded: "The court has very carefully considered and weighed the aggravating factors and finds that aggravating factors 1 and 2 should be given substantial weight and that aggravating factors 3 and 4 should be given great weight."
[3] The court noted the following concerning nonstatutory mitigators:

Evidence offered in support on non-statutory mitigating factors proved beyond a reasonable doubt the following: Defendant is a fair and considerate father to his four children including two stepchildren; he played games with them, he participated in their activities, helped with homework and treated them equally both before and after the separation between himself and his ex-wife, the children's mother. Defendant has always supported his children financially. Before the separation defendant was always steadily employed in Orange County and when the family lived in New York City. Defendant helped willingly with the housework and cooking. Before the separation defendant attended church regularly and was active in church affairs by singing and testifying and "gave his heart to God in the church." Defendant participated willingly and actively in family gatherings. From jail the defendant talks to his children and stepchildren on the telephone and writes them inspirational and loving letters and this contact is important to the children and they would continue this contact with defendant were he to be sentenced to life in prison. Defendant's mother loves him and communicates with him and would visit him in prison were he to be sentenced to life in prison. Defendant's conduct and lifestyle changed abruptly for the worse about two years ago.
The court concluded as follows: "The court has very carefully considered and weighed the nonstatutory mitigating factors and finds that they should be given considerable weight."
[4] Ruiz claims that the trial court erred on the following points: (1) prosecutorial misconduct in the guilt phase; (2) prosecutorial misconduct in the penalty phase; (3) admission of evidence concerning a prior robbery; (4) admission of a photo of the victim; and (5) admission of details concerning a prior conviction for resisting arrest with violence.
[5] During cross-examination of Ruiz, the following discussion took place:

Q. Okay. First let me ask you something. Didn't Delio tell you that Rolando Landrian wore a lot of jewelry and kept lots of money in his car, so it was going to be a robbery?
A. I don't know nothing about no robbery, ma'am. You're putting words into my mouth now.
Q. Well, Delio tells you in the context of what he wants done to Rolando Landrian, that Rolando Landrian wears lots of jewelry and keeps lots of money in his car?
A. What he says is that the person that goes down there to rough him up could take it because he does have a lot of jewelry and he does carry a large sum of money, yes.
Q. And that's a robbery?
A. As far asyeah.
Q. You know what a robbery is?
A. How do you know what I know what a robbery is?
Q. Well, are you trying to suggest to this jurylet me look for a moment. You told Mr. Gonzaleznot Mr. Gonzales, I'm sorry, Mr. Donerly that you sell drugs, but you don't do things like hurting people, right?
A. Why should I?
Q. Well, you're more than willing to use a gun in order to get what you want, aren't you?
A. If you have a gun, that doesn't mean you're going to hurt somebody.
Q. Pointing a gun at someone doesn't mean you're willing to hurt someone?
A. If you point a gun at somebody doesn't mean you're going to shoot the gun. If you point a gun at somebody, it doesn't mean that it's loaded.
At this point, the prosecutor asked to approach the bench and argued that appellant had opened the door concerning the prior robbery charge in Seminole County. The prosecutor contended that she should be able to establish that he has been convicted of robberies before and that is how he knows what a robbery is. She also argued that the State should be able to introduce the portion of a letter written by Ruiz's mother in which she stated that Ruiz told her he did not show up for his court appearance on the robbery charge because he did not do those robberies alone. The court did not allow the prosecutor to pursue this line of inquiry with Ruiz but did allow her to recall and question Ruiz's mother, Julia Ramirez. Accordingly, during the State's case in rebuttal, the prosecutor called Mrs. Ramirez and questioned her concerning her alleged conversation with Ruiz at K-Mart on April 7:
Q. Didn't he mention to you that one of the reasons that hehe mentioned that they would lock him up for a long time and he didn't rob those stores aloneor those store [sic] alone?
Mrs. Ramirez answered in the affirmative. The State entered into evidence a letter written by Mrs. Ramirez attesting to the above.
[6] See Charles W. Ehrhardt, Florida Evidence § 608.1, at 398 (1998 ed.) ("If a witness is cross-examined concerning a collateral ... matter, the examiner is bound by the answer given. Counsel must `take' the answer of the witness and may not subsequently introduce extrinsic evidence to impeach the witness.").
[7] See id. at 401 ("A witness may `open-the-door' during the direct testimony to impeachment concerning matters that would not otherwise be permissible." (emphasis added)).
[8] See, e.g., Garcia v. State, 622 So.2d 1325, 1332 (Fla. 1993) ("Once again, we are compelled to reiterate the need for propriety, particularly where the death penalty is involved...."); Nowitzke v. State, 572 So.2d 1346, 1356 (Fla. 1990) ("[W]e are distressed over the lack of propriety and restraint exhibited in the overzealous prosecution of capital cases, and we feel compelled to reiterate [the warning expressed in Bertolotti]."); Garron v. State, 528 So.2d 353, 359 (Fla. 1988) ("Such violations of the prosecutor's duty to seek justice and not merely `win' a death recommendation cannot be condoned by this Court.... [I]t appears that the admonitions in Bertolotti went unheeded and that the misconduct in this case far outdistances the misconduct in Bertolotti."); Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985) ("We have recently addressed incidents of prosecutorial misconduct in several death penalty cases.... This Court considers this sort of prosecutorial misconduct, in the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings.").
[9] See, e.g., Campbell v. State, 679 So.2d 720 (Fla. 1996) (reversing death sentence due to prosecutorial misconduct); King v. State, 623 So.2d 486 (Fla. 1993) (reversing death sentence due to prosecutorial misconduct); Garcia (reversing two death sentences due to prosecutorial misconduct); Nowitzke (reversing two first-degree murder convictions due to prosecutorial misconduct); Garron (reversing first-degree murder conviction due to prosecutorial misconduct).
[10] See Urbin v. State, 714 So.2d 411 (Fla. 1998) (reversing death sentence and condemning extensive prosecutorial misconduct).
[11] Double jeopardy principles do not bar a new trial in the present case. See, e.g., Keen v. State, 504 So.2d 396, 402 n. 5 (Fla.1987) ("We find no double jeopardy problem with a retrial of Keen arising from the prosecutorial misconduct here.").