# Supreme Court of Florida

_____

No. SC15-1794
_____

**BARRY TRYNELL DAVIS, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 11, 2017]

PER CURIAM.

Barry Trynell Davis, Jr., appeals his convictions and sentences of death for the murders of John Gregory Hughes and Heidi Ann Rhodes. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Davis's convictions but vacate the sentences of death and remand for a new penalty phase pursuant to Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), petition for cert. filed, No.16-998 (U.S. Feb. 13, 2017), due to the jury's nonunanimous recommendations of death for both victims, which are not harmless beyond a reasonable doubt.

## FACTS AND BACKGROUND

The murders occurred on May 7, 2012. At the time of the murders, Davis was twenty-six years old and had one child, Andreian ("Drey"), with Tiffani Steward, his on-and-off girlfriend of several years.

The victims, John Gregory Hughes and Heidi Ann Rhodes, were last seen on May 7, 2012. Hughes was forty-nine years old. Rhodes was almost forty-one years old. Rhodes' dog, Molly, who went almost everywhere with Rhodes, was also missing. At the time of their disappearance, Hughes and Rhodes had been dating for approximately one year. The victims lived together in Hughes' house in Santa Rosa Beach, Florida, although Rhodes also rented another property.

Davis and Hughes knew each other from previously being incarcerated at the same time. According to witnesses, the two stayed in contact after their independent releases. Davis sold drugs to Hughes.

On May 9, 2012, Rhodes' employer, Ray Webb, became concerned about Rhodes' well-being after she did not show up for an appointment. Webb drove to Hughes' house and Rhodes' house and found no one at either place. There was no sign of Molly at either house. Webb, however, noticed "a lot of cleaning materials, buckets and mops and things sitting in the edge of the driveway" of Hughes' house.

A few days later, Webb reported Rhodes missing. At Webb's request, the Walton County Sheriff's Office (WCSO) went to Hughes' house to conduct a welfare check on Rhodes. WCSO found no persons or vehicles present, but nothing seemed out of the ordinary.

WCSO then received a missing-persons report from Rhodes' sister, Cecaire McPherson. Rhodes' family had become worried when Rhodes did not contact her mother on Mother's Day. WCSO conducted welfare checks on Rhodes at both Rhodes' house, which appeared to be in a normal, lived-in condition, and Hughes' house, which appeared to be empty. When the welfare checks did not locate Hughes or Rhodes, WCSO initiated missing-person investigations.

Rhodes' sisters also went to Rhodes' house and Hughes' house looking for the victims. Both houses were vacant, and Rhodes' mailbox was completely filled. When they looked inside Hughes' house, they saw a commercial mop bucket in the middle of the living room floor. The only furniture in Hughes' house was a pool table, and it looked like the TV had been pulled off the wall. Hughes' 2003 Cadillac Escalade EXT was not visible on the property.

Officers were led to Davis as a person of interest in Hughes' and Rhodes' disappearance through a series of transactions on Hughes' bank card and several checks written to the order of Davis from Hughes' bank account. When asked about Hughes' disappearance in a series of interviews, Davis told officers that

Hughes paid him to load Hughes' furniture into a rental truck and to later clean and manage Hughes' residential property. Davis stated that (1) he last saw Hughes and Rhodes when they left Hughes' house in the rental truck full of furniture, though he did not know where Hughes moved or how to contact him; (2) he remembered Hughes saying that he was moving to Barbados to hide from people to whom he owed money for drugs;[1] and (3) Molly no longer belonged to Rhodes.

On June 18, 2012, officers executed a search warrant on a storage unit at Freeport Storage that Davis and Donna Gee, Davis's friend, were renting. Inside the storage unit, officers found four barstools that belonged to Hughes.[2] Also that day, investigators interviewed Cecil Galloway, Davis's friend, who said he had helped Davis move furniture out of a house in Santa Rosa Beach. Galloway did not remember seeing a male owner or female at the house but remembered that, when he arrived, "the dressers [in the house] were already emptied," although "the house appeared to have everything in it." According to Galloway, everything in the house was loaded into a yellow Ryder pick-up truck in about three hours.

---

1. A neighbor of Hughes' also recalled Davis saying that Hughes was moving to Barbados.

2. Kelly Kamens and William G. Smith, to whom Hughes had previously given power of attorney, identified the barstools as belonging to Hughes.

On July 10, 2012, officers executed a search warrant on Davis's home in Argyle, Florida,[3] looking for Hughes' Regions Bank debit card, which they did not find. Later that day, Davis was arrested for grand theft of Hughes' vehicle and credit card fraud related to use of Hughes' bank card.

While Davis was in jail, law enforcement officers interviewed Steward several times. However, she was not forthcoming with information. On September 25, 2012, Davis was released from jail. Following his release, Davis and Steward moved from Argyle to Destin, Florida and rented for several months a house referred to as "the Grand Key Loop house."

In October 2012, WCSO found Hughes' Escalade, which had been reported stolen, parked in the back of Kenneth Ingram's property in DeFuniak Springs, Florida, covered by a tarp. Ingram told officers that Davis had asked to park the Escalade on his property. Upon searching the Escalade, officers discovered that the back bench seat was missing, and the back carpet had been roughly cut out. The carpet remaining inside the Escalade had bleach stains, and the interior was covered in mold. Cadaver dogs used in law enforcement's investigation detected human remains inside the Escalade. Galloway stated that he last saw the vehicle at

---

3. Davis and Steward moved to this house a few weeks after Hughes' and Rhodes' murders after paying off the debt owed on their previous home, referred to as "the New Harmony house," in cash.

Davis's home in Argyle, where he helped Davis remove the seat and carpet, which Galloway remembered being moist. According to Galloway, when he asked Davis why they were removing the seat and carpet from the Escalade, Davis said that a body had been in the vehicle. Galloway also reported seeing remnants of burnt carpet at Davis's home in Argyle. Likewise, Steward recalled Davis burning the back seat of the Escalade at his home in Argyle.

On November 12, 2012, Steward met in secret with Investigator Armstrong at her and Davis's previous home. Eventually, the interview was relocated to the sheriff's office, where Chief Assistant State Attorney Greg Anchors and Steward's attorney were also present. After the interview, Armstrong arrested Steward under a warrant for dealing in stolen property and took her to jail.

The next day, Steward, with her attorney, met with the State Attorney and recounted the entire story of what she witnessed on May 7, 2012, and the weeks following. Steward was told she would be given immunity for testifying against Davis. While Steward had previously withheld information from law enforcement as to the details of what happened that night, she was the only witness, other than Davis, who could recount at trial what happened at Hughes' house that night.

Steward testified at trial that, on May 7, 2012, Davis was on his way to Hughes' house when he stopped to see Steward. Because she did not trust that Davis was loyal in their relationship, Steward demanded that she go with him. On

their way, Davis told Steward that he knew Hughes was wealthy and intended to kidnap Hughes and hold him for ransom. When they arrived at Hughes' house, Steward observed that Hughes did not seem to be expecting Davis. Nevertheless, Hughes invited Davis and Steward to come inside and stay for dinner.

Before dinner, Steward drove Rhodes to Publix to purchase beverages. Before they left the house, Hughes gave Rhodes his debit card with the PIN to use for the purchase. At Publix, Steward waited in the car while Rhodes went inside. While Steward waited in the car for Rhodes, Davis called Steward's cell phone several times, telling her to return to Hughes' house immediately.

When Steward and Rhodes returned to Hughes' house, Steward entered through the front door ahead of Rhodes. According to Steward, when Rhodes entered, Davis grabbed her, began strangling and hitting her, and told Steward to lock the door. Davis rendered Rhodes unconscious and then "drug [Rhodes] into the bedroom" by her foot.

Steward testified at trial that she saw Hughes' body lying motionless on the floor in the master bedroom and heard noises that sounded like snoring coming from Hughes. According to Steward, "there was blood everywhere"—around Hughes' head and on the floor, wall, and nightstand in the master bedroom and on Davis's clothing. In her statement to police that was read at trial, Steward said Davis told her that while she and Rhodes were at Publix, "he made Hughes open a

safe and there was pills, weed, and car title in the safe." Then, "[Davis] said Hughes tried to run to his cell phone located on the night stand." Steward told police that when she saw the blood, Hughes was lying in front of the night stand.

After both Hughes and Rhodes were unconscious and in the master bedroom, Davis began filling the bathtub in the master bathroom with water. While the bathtub was filling, Davis asked Steward to get his backpack out of the car. Steward did not know what was in the backpack.

Steward testified that when she returned with the backpack, Davis took duct tape out of the backpack and "wrapped it around [Hughes' and Rhodes'] ankles." While Davis wrapped their ankles with duct tape, the victims' heads and shoulders were submerged in the bathtub. At this point, Steward thought she heard a noise and told Davis that the victims were still alive, to which Davis responded that the noise was just gas leaving their bodies and that the victims were dead.

Throughout the events that took place at Hughes' house on May 7, 2012, Steward begged Davis to let her leave and return home to their son, Drey. Finally, after the victims were submerged and bound in the bathtub, Davis let Steward leave Hughes' house and indicated that he would be right behind her. Steward testified that she last saw the victims submerged in the bathtub in the master bathroom of Hughes' house. Steward left Hughes' house in her Ford Edge that she and Davis had driven to Hughes' house that night. Davis left Hughes' house in

Hughes' Escalade, following Steward. Davis told Steward that he would return later to Hughes' house to "clean up and get the bodies." Steward testified that Davis threatened "that he would kill [her] family . . . if [she] ever said anything [or] admitt[ed] to being there with him" that night. Steward testified that she believed these threats to be credible because Davis had previously threatened her family's safety.

In the days following the murders, Davis returned to Hughes' house to clean, which included bleaching Hughes' entire house and removing a portion of drywall that was covered in blood. Davis told Steward that "he pulled the wall out at the house, the wall that Mr. Hughes was laying on the floor beside, because there was blood everywhere." Investigator Sunday stated that "a large section of drywall [in Hughes' house] . . . appeared to have been cut away and did not appear to be anywhere on the premises." Steward testified that Davis told her that "he wrapped [the bodies] up and put them in the Escalade for a couple of days."

The next time Steward saw Davis—a day or two after the murders—he was dragging a blue container from behind his house over to a burn pit. Steward remembered that the "blue container" "smelled really bad, and it looked like it was really heavy." Steward assumed the victims' bodies were inside the container. Davis later told Steward that he had cut up the victims' bodies and burned them in the burn pit. During her deposition, Steward remembered that she heard Davis

using a saw late one night. She said that she believed Davis used a saw to cut up the victims' bodies before burning them.[4] Steward also remembered Davis "bleaching the porch around the same area that [she] heard the saw." Steward also saw a bench car seat in the burn pit at Davis's house, which she knew was from Hughes' Escalade.

Davis told Steward that he gave a bag of ashes to Galloway, who did not know what the bag contained, and told him to dispose of it. Steward also told law enforcement officers that she saw Davis hand Galloway a trash bag. Galloway confirmed to law enforcement that Davis gave him a trash bag of burned wood and ashes in June 2012 and told him to get rid of it, which he placed into the garbage can at the end of the driveway at Davis's house in Argyle.[5]

In the weeks following the murders, Davis rented a U-Haul[6] and moved Hughes' furniture and personal belongings out of Hughes' house. Hughes' family testified that several of these items had sentimental value and had been passed down through Hughes' family. Davis hired "laborers" to help him load Hughes'

---

4. Steward did not tell officers about the saw during prior interviews. At trial, Steward claimed that "something [they] were talking about or something in deposition . . . made [her] remember about the saw."

5. In another version of the story, Davis told Steward that he had scattered the ashes, or the parts of the bodies that would not burn.

6. Gee was also on the U-Haul rental and told law enforcement that "she rented the U-Haul for herself . . . to move her dad who had just recently divorced."

furniture into the moving truck. Davis paid the laborers in cash and gave them several of Hughes' items, including scuba tanks, fishing rods and reels, and pool cues. Davis instructed those close to him to lie consistent with his story—for example, that the rental truck was a Ryder truck rather than a U-Haul. Hughes' neighbors testified to seeing a moving truck outside Hughes' house around this time. Davis took some of Hughes' furniture to a storage unit at Freeport Storage, which he and Gee rented. Other furniture was taken to Davis's home. At Davis's instruction, Steward sold some of Hughes' belongings to pawn shops and on Craigslist.

In the weeks following, Davis forged three of Hughes' checks, which he wrote out to himself. Davis also checked the voicemail on Hughes' cell phone and used Hughes' cell phone to call the 800 number on Hughes' bank cards to check the account balances. In its sentencing order, the trial court stated that Davis "looted John Gregory's Hughes's bank accounts and stole nearly every piece of property from his home."

Once Steward began cooperating with law enforcement, she gave Investigator Armstrong permission to enter the Grand Key Loop house. Steward then directed officers to some of Hughes' clothes that were inside the house. Armstrong and Steward then went to Hughes' house for Steward to show Armstrong what happened on May 7, 2012. That same day, Davis was arrested for

- 11 -

a narcotics violation during a traffic stop due to an outstanding arrest warrant from Okaloosa County, Florida. During that stop, officers found a backpack that matched Steward's description of the backpack in which Davis stored the duct tape that he used in murdering Hughes and Rhodes.

Davis was indicted and arrested on two counts of first-degree murder for the deaths of Hughes and Rhodes. Following the guilt phase, the jury convicted Davis of the first-degree murder of Hughes and the first-degree murder of Rhodes. At the penalty phase, Davis's family—mother, uncle, father, and stepmother—testified about his childhood experiences, including his relationship with his grandfather, his academic struggles, and his moving between Los Angeles, California, and Florida. Several childhood photographs of Davis were presented to the jury. Several doctors, specializing in neurology and psychology, opined on Davis's cognitive functioning, including his IQ, which Dr. Julie Harper, a psychologist, reported to be a combined 87, history of head trauma, depression, and anxiety. The jury recommended two sentences of death—by a vote of nine to three for the murder of Hughes and a vote of ten to two for the murder of Rhodes.

At the Spencer[7] hearing, the State did not present any additional aggravating evidence. The defense presented the testimony of one witness, Dr. Harper, who

_____

7. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

- 12 -

also testified during trial.  The trial court imposed a sentence of death for both murders.[8]  In its sentencing order, the trial court found that the following aggravating factors were proven beyond a reasonable doubt as to the murder of Hughes and assigned them the noted weight: (1) prior conviction of capital felony or felony involving violence (PVF) (great weight), (2) committed for pecuniary gain (great weight), (3) committed while engaged in the commission of an attempt to commit robbery or burglary (no additional weight because merged with second aggravating factor), and (4) committed in a cold, calculated, and premeditated manner (CCP) (great weight).  For the murder of Rhodes, the trial court found that the following aggravating factors were proven beyond a reasonable doubt and assigned them the noted weight: (1) PVF (great weight), (2) committed while engaged in the commission of an attempt to commit robbery or burglary (great weight), (3) committed for pecuniary gain (no additional weight because merged with second aggravating factor), (4) committed for the purpose of avoiding arrest

---

8. The jury also convicted Davis of (a) burglary of a dwelling, (b) theft, (c) two counts of grand theft of an automobile, (d) burglary of unoccupied structure, (e) fraudulent use of a credit card ($100 or more), (f) three counts of forgery of a check, and (g) three counts of uttering a forged check.  The trial court imposed the following sentences for the other convictions (totaling seventy years of imprisonment to run consecutively with credit for time served): fifteen years' imprisonment for burglary of a dwelling and five years for burglary of an unoccupied structure, five years each for two counts of car theft and five years for theft, five years for fraudulent use of a credit card, five years each for three counts of forgery of a check, and five years each for three counts of uttering a forged instrument.

- 13 -

(great weight), (5) CCP (great weight), and (6) the crime was especially heinous, atrocious, or cruel (HAC) (great weight). The trial court evaluated forty nonstatutory mitigating circumstances, many of which it assigned little or no weight.[9] The nonstatutory mitigating circumstances that the trial court assigned

9. The forty nonstatutory mitigating circumstances that the trial judge found to be proven by a preponderance of the evidence and their respective assigned weights were: (1) Davis lived in a violent neighborhood for a significant period of time (little weight), (2) Davis lived in Los Angeles during the Rodney King riots (no weight), (3) Davis remembers seeing blood, chalk lines, and other evidence of homicides on his way to school in Los Angeles (little weight), (4) Davis's mother was detached and unaffectionate and had very limited contact with him after he moved to Florida to live with his father (little weight), (5) Davis could not read and write at grade level until he was ten years old (no weight), (6) Davis had limited contact with his father between ages six and nine (no weight), (7) Davis has a close bond with his siblings (little weight), (8) Davis unexpectedly moved to Florida at nine years old (no weight), (9) Davis exhibited good courtroom behavior during trial (no weight), (10) Davis is capable of strong, loving relationships (little weight), (11) Davis has a special bond with his son (moderate weight), (12) Davis was homeschooled for two years to catch up academically (no weight), (13) Davis has a family who loves him very much (moderate weight), (14) Davis has a history of traumatic brain injury (moderate weight), (15) Davis first encountered racism in Pop Warner football when a teammate called him the "n" word without being punished (no weight), (16) Davis was skilled in sports (no weight), (17) Davis suffers from anxiety (no weight), (18) Davis was helpful to an elderly neighbor (little weight), (19) Davis saved an elderly man from drowning (substantial weight), (20) Davis felt abandoned by his mother (little weight), (21) Davis felt abandoned by his father and stepmother after his arrest at seventeen years old (no weight), (22) Davis assisted Hughes (the victim) in prison when other inmates were planning to attack him (no weight), (23) Davis has a history of illegal drug use (little weight), (24) Davis was a victim of a stabbing and robberies during his early drug dealing years while estranged from his family (no weight), (25) Davis suffered from emotional distress due to his relationship with Steward in the weeks preceding the murders (no weight), (26) Davis has memory deficits as a result of traumatic brain injury (little weight), (27) Davis has a tic disorder (no weight), (28) Davis suffers from executive dysfunction (no weight), (29) Davis often stutters and

more than "little weight" were that Davis has a special bond with his son (moderate weight); Davis has family who loves him very much (moderate weight); Davis has a history of traumatic brain injury (moderate weight); Davis saved an elderly man from drowning (substantial weight); Davis was a good father to his son (moderate weight); and Davis has been diagnosed with mild neurocognitive disorder due to traumatic brain injury, major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and post traumatic stress disorder (moderate weight). This is Davis's direct appeal.

## ANALYSIS

Davis raises the following claims: (1) the trial court erred in denying Davis's motion to suppress evidence obtained during the July 10, 2012, search of Davis's

---

has faced ridicule for this (no weight), (30) Davis's parents had a dysfunctional relationship (no weight), (31) Davis suffered the loss of his paternal grandfather at a young age (little weight), (32) Davis was a good father to his son (moderate weight), (33) Davis received his GED (no weight), (34) Davis suffered the loss of a family friend at a young age (little weight), (35) Davis suffers from borderline intellectual functioning in the area of perceptual reasoning and a specific learning disorder with impairment in reading (no weight), (36) Davis has been diagnosed with mild neurocognitive disorder due to traumatic brain injury, major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and post traumatic stress disorder (moderate weight), (37) Davis provided financial and other assistance to individuals in need of assistance (no weight), (38) Davis suffered the loss of an elderly gentlemen whom he would see in a park when he was a child (no weight), (39) Davis was previously incarcerated in prison and exposed to shocking behavior by other inmates (little weight), and (40) Davis has a personality disorder (little weight).

home in Argyle; (2) reversible error occurred when the trial court admitted evidence that Davis possessed a revolver "in the past"; (3) reversible error occurred when the trial court allowed the State to display a photo of Steward crying on the witness stand during closing argument; (4) Davis's sentences were imposed in violation of Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and Hurst, 202 So. 3d 40; (5) the trial court improperly found the avoid arrest aggravating factor for the murder of Rhodes; (6) the trial court improperly found the CCP aggravating factor for both murders; (7) reversible error occurred when the trial court failed to properly evaluate multiple nonstatutory mitigating circumstances. We deny relief as to the guilt phase claims, and because we vacate Davis's sentences of death and remand for a new penalty phase in light of Hurst, we do not address the other penalty phase claims.

## I. Motion to Suppress Evidence Obtained During July 10, 2012, Search

Consistent with WCSO policy, officers photographed and videotaped their July 10, 2012, search of Davis's home in Argyle, Florida, for Hughes' bank card. Approximately 150 photos were taken during the search: twenty photos record serial numbers, vehicle identification numbers, brand names, title certificates, or other similar information of specific items inside Davis's house; sixty photos depict specific items of furniture, furnishings, electronics, appliances, or personal property; fifty photos closely document paperwork, receipts, cards, books, or the

like; fifteen photos detail hydroponic growing equipment and materials; seven photos depict marijuana and paraphernalia found in the bathroom closet that officers seized; and one photo focuses on an unattached building. Although officers did not find Hughes' bank card during the search, officers used the photographs and videos gathered during the search to obtain a subsequent search warrant to seize Hughes' items found inside Davis's home. These photos were admitted into evidence and discussed at length at trial.

Davis filed a motion to suppress with the trial court, arguing that the photographs and video taken of the July 2012 search exceeded the scope of the search warrant. After an evidentiary hearing, the trial court denied Davis's motion to suppress, finding in pertinent part:

> [L]aw enforcement acted in a reasonable manner in obtaining and executing the search warrant in July 2012.
> After reviewing the photographs taken during law enforcement's July 10, 2012, search of [Davis's] residence, the photographs do not reflect that an "inventory search" was conducted as the defendant alleges. Instead, the photographs support the testimony offered during the hearing that the policy and procedure of [WCSO] regarding execution of search warrants was followed.

Davis argues that law enforcement violated his constitutional right against improper search and seizure by exceeding the scope of the warrant during the July 2012 search of his residence. The State argues that officers acted properly during the search. We conclude that Davis is not entitled to relief on this claim.

"Both the federal and state constitutions prohibit the government from conducting unreasonable searches." Harrell v. State, 162 So. 3d 1128, 1130 (Fla. 4th DCA 2015); accord U.S. Const. amend. IV; art. I, § 12, Fla. Const. "[A] principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment . . . ." Jardines v. State, 73 So. 3d 34, 51 (Fla. 2011) (quoting Welsh v. Wisconsin, 466 U.S. 740, 748 (1984)), aff'd, 133 S. Ct. 1409 (2013). This Court is "bound to follow the interpretations of the United States Supreme Court with respect to the Fourth Amendment and provide to Florida citizens no greater protection than those interpretations." Soca v. State, 673 So. 2d 24, 27 (Fla. 1996) (citing Bernie v. State, 524 So. 2d 988, 990-91 (Fla. 1988)).

We "accord a presumption of correctness to the trial court's rulings on motions to suppress with regard to the trial court's determination of historical facts," but we "independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth . . . Amendment and, by extension, article I, section 9 of the Florida Constitution." Fitzpatrick v. State, 900 So. 2d 495, 510 (Fla. 2005) (quoting Nelson v. State, 850 So. 2d 514, 521 (Fla. 2003)).

In this case, officers procured a warrant for their July 2012 search of Davis's residence for Hughes' debit card. It is well-settled that persons have a reasonable

expectation of privacy in their homes.  See Jardines, 73 So. 3d at 36.  "[T]he scope of a lawful search of fixed premises pursuant to a warrant extends to the entire area in which the object of the search may be found."  Jackson v. State, 18 So. 3d 1016, 1028 (Fla. 2009) (citing United States v. Ross, 456 U.S. 798, 820-21 (1982)).  "This includes the authority to search through any containers, even those that are locked, that would reasonably contain the items specified in the warrant."  Id.

Turning to this case, the object of the warrant for the July 2012 search was Hughes' bank card.  The United States Supreme Court stated in Horton v. California, 496 U.S. 128 (1990), in which officers executed a warrant describing three stolen rings, "Because rings could be located almost anywhere inside or outside a house, it is unlikely that a warrant to search for and seize the rings would restrict the scope of the search."  Id. at 146.  Likewise, the scope of the July 2012 search encompassed areas in Davis's home where officers had probable cause to believe Hughes' bank card might be.  Officers could search "almost anywhere inside" Davis's home for Hughes' bank card.  Id.  Thus, we conclude that the items photographed by officers during the July 2012 search were within the scope of the warrant, and the video recordings and photographs, taken pursuant to WCSO policy, did not cause any additional invasion into Davis's privacy.  See Arizona v. Hicks, 480 U.S. 321, 323-25 (1987).  Therefore, officers did not violate Davis's constitutional right against improper search and seizure by photographing and

videotaping the July 2012 search.  Accordingly, we affirm the trial court's denial

of Davis's motion to suppress and deny relief on this claim.

## II.  Evidence that Davis Possessed a Revolver in the Past

Davis next argues that the trial court erred in admitting evidence of his prior

possession of a revolver.  Specifically, the following exchange took place between

Steward and defense counsel at trial during Steward's cross-examination about the

night of May 7, 2012:

> Q.  Didn't shoot anybody?
> A.  No.  I never said [Davis] shot anybody.
> Q.  Okay.  And you never saw a firearm . . . that night; right?
> A:  No, sir, I did not.
> . . . .
> Q.  And what – what did you tell her in your note to Ms. Armstrong in January of 2013?
> A.  That [Davis] had told me he pulled out a gun and Mr. Hughes said, You've got to be kidding me.
> Q.  Well, you didn't see a gun that night.
> A.  No.
> Q.  You didn't see any gun shells on the floor, did you?
> A.  No.  To my understanding, [Davis] had just hit [Hughes] with it.

On redirect examination, the following exchange took place between Steward and

the prosecutor, Mr. Elmore:

> Q.  Ms. Steward, concerning the gun:  You never did say that Mr. Hughes was shot, did you?
> A.  No, sir.
> Q.  Mr. Davis never told you he was shot?
> A.  No, sir.
> Q.  Okay.  Did [Davis] ever even go into detail about how he hit [Hughes] or what he hit [Hughes] with?
> A.  He just said he hit him.  I don't remember.

Q. Okay. So you don't know, and you didn't know when you advised the officers of what you had been told, whether Mr. Davis hit him with a gun, whether he hit him with a fist, or whether he hit him with some other object in the house?
A. Correct.
Q. And you never said you saw a gun that night; is that correct?
A. Correct.
Q. You had only seen <u>a gun in the past in the possession of Mr. Davis</u>?

(Emphasis added.) Defense counsel objected, arguing that Davis's prior possession of a firearm was not relevant and the question was "prejudicial and not probative." <u>See</u> §§ 90.402, 90.403, Fla. Stat. (2016). The trial court overruled the objection, and the questioning proceeded: "Q. What kind of gun have you seen Mr. Davis possess <u>in the past</u>?" (Emphasis added.) Again, defense counsel raised a relevance objection, which the court overruled. <u>See id.</u> § 90.402. Mr. Elmore continued questioning Steward:

A. It was a type – like an old-timey looking one that like rolls; you know, rolls around.
Q. You're not familiar with guns?
A. No, sir.
Q. You're talking about a revolver instead of a –
A. Yes.

Later during closing argument, referring to this testimony, the prosecutor stated that Steward had "seen [Davis] with a black revolver <u>in the past,</u> and he's not the first drug dealer to have one." (Emphasis added.) The defense did not raise any additional objection to this statement by the prosecutor during closing argument, nor was it raised as a separate issue in this appeal. Because defense

counsel raised specific objections to this line of questioning at trial, the error was preserved for appeal.  E.g., Overton v. State, 976 So. 2d 536, 547 (Fla. 2007); Steinhorst v. State, 412 So. 2d 332, 338 (Fla. 1982).  We conclude that Davis is not entitled to relief on this claim.

"The concept of 'opening the door' is 'based on considerations of fairness and the truth-seeking function of a trial.' "  Dennis v. State, 817 So. 2d 741, 753 (Fla. 2002) (quoting Rodriguez v. State, 753 So. 2d 29, 42 (Fla. 2000)).  "[T]o open the door, 'the defense must first offer misleading testimony or make a specific factual assertion which the state has the right to correct so that the jury will not be misled.' "  Robertson v. State, 829 So. 2d 901, 913 (Fla. 2002) (quoting Bozeman v. State, 698 So. 2d 629, 630 (Fla. 4th DCA 1997)).  "As an evidentiary principle, the concept of 'opening the door' allows the admission of otherwise inadmissible testimony to 'qualify, explain, or limit' testimony or evidence previously admitted."  Ramirez v. State, 739 So. 2d 568, 579 (Fla. 1999) (quoting Tompkins v. State, 502 So. 2d 415, 419 (Fla. 1986)).

In this case, defense counsel opened the door to the prosecution redirecting Steward to clarify the foundation for her belief that Davis had a gun on the night of the murders.  On cross-examination, the defense presented the inconsistency between Steward's prior statement to law enforcement that Davis had a gun at Hughes' house that night and her testimony at trial that she never saw or heard a

gun that night. Therefore, the disputed testimony that Davis possessed a revolver "in the past" served to explain why Steward believed Davis when he told her he had a gun at Hughes' house that night, even though the murder weapon was not a firearm. Thus, we conclude that the trial court's admission of this testimony was not error. Accordingly, we deny relief on this claim.

### III. Photo of Steward Crying on the Witness Stand

At trial, Steward cried on the witness stand as she told the jury what she witnessed on the night of May 7, 2012, and in the weeks following. During closing argument, the prosecutor used a PowerPoint presentation consisting of over 100 slides that included photographs, some of which had been entered into evidence. It is unclear whether opposing counsel or the court reviewed the presentation before it was presented to the jury during closing argument. One slide included a picture of Steward crying on the witness stand during the guilt phase of the trial.

Davis argues that the trial court erred in allowing the State to present a photo of Steward crying on the witness stand because the photo likely caused the jury's verdict to improperly rest upon emotional grounds rather than facts proven by the evidence. The State argues that the trial court did not abuse its discretion by allowing the photo to be presented and used as a demonstrative aid. Because defense counsel objected to the prosecution's presentation of the picture during

trial, this issue is preserved for appellate review.  Wright v. State, 19 So. 3d 277, 295 (Fla. 2009).  We conclude, however, that there was no error and deny relief on this claim.

We reject Davis's argument that Florida Rule of Judicial Administration 2.450(h) renders improper the prosecutor's use of this picture during closing argument.  Rule 2.450(h) states:

> Impermissible Use of Media Material.  None of the film, videotape, still photographs, or audio reproductions developed during or by virtue of coverage of a judicial proceeding shall be admissible as evidence in the proceeding out of which it arose, in any proceeding subsequent or collateral thereto, or upon retrial or appeal of such proceedings.

The "still photograph" of Steward crying on the witness stand that Davis challenges was not admitted into "evidence" at trial.  Thus, rule 2.450(h) does not entitle Davis to relief on this claim.

As this Court has explained, an attorney's role in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence."  Cardona v. State, 185 So. 3d 514, 520 (Fla. 2016) (quoting Ruiz v. State, 743 So. 2d 1, 4 (Fla. 1999)).  We agree with the trial court's finding that the picture of Steward accurately represented what the jurors witnessed first-hand during trial.  Therefore, the picture was not misleading.  Further, the presentation of the photo was brief.  Moreover, defense counsel did not raise any advance objection to the State's use of a slideshow during closing argument.  Thus, the trial court did not err in denying

- 24 -

defense counsel's objection, nor did the trial court abuse its discretion in denying mistrial on these grounds. Accordingly, we deny relief on this claim.

## IV. Sufficiency of the Evidence

"[T]his Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed . . . ." Yacob v. State, 136 So. 3d 539, 545 (Fla. 2014); see Fla. R. App. P. 9.142(a)(5). In determining the sufficiency of the evidence, our inquiry is "whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

Using a general verdict form, the jury found Davis guilty as charged on Counts 1 and 2 for first-degree murder. In closing argument, the State argued, "this is sort of an and/or situation. It can be both [felony or premediated murder] and it was in this case, or it can be either." See Crain v. State, 894 So. 2d 59, 73 (Fla. 2004). We conclude that the record contains competent, substantial evidence to support Davis's convictions of first-degree murder.

Essentially Rhodes' and Hughes' entire network—family, friends, and coworkers—testified that they did not see or hear from Rhodes or Hughes after May 7, 2012, the night that Steward says she and Davis went to Hughes' house.

There was no evidence of Hughes and Rhodes disappearing on their own free will, such as travel plans, forwarding addresses, or passport inquiries.

Steward, Davis's on-and-off girlfriend and the mother of Davis's child, testified at trial that Davis told her he was going to "get" Hughes. Steward also testified that she witnessed Davis murder the victims and gave details of what she witnessed the night of the murders, as well as in the weeks following the murders—including how Davis rendered the victims unconscious, how Davis drowned the victims in Hughes' bathtub, how Davis disposed of the bodies, and how Davis distributed Hughes' property. Further, consistent with Steward's testimony that Davis's motive for killing Hughes was financial gain, Davis was found with almost all of Hughes' belongings. Indeed, Hughes' neighbor "saw the defendant driving" a U-Haul on Hughes' property on May 14, 2012. The jury also convicted Davis of two counts of burglary. Thus, we conclude that the record supports Davis's convictions of first-degree murder. Accordingly, we affirm Davis's convictions of first-degree murder for the murders of Hughes and Rhodes.

### V. **Hurst v. Florida** and **Hurst**

The United States Supreme Court's decision in Hurst v. Florida was pending during Davis's trial. The trial court denied Davis's Motion to Continue Death Penalty Proceedings Pending U.S. Supreme Court's Decision in Hurst v. Florida without discussion. Davis argues that his sentences of death were imposed in

violation of <u>Hurst v. Florida</u> and this Court's opinion on remand in <u>Hurst</u>, which held that "<u>Hurst v. Florida</u> requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury." 202 So. 3d at 44. As we explained, "[i]n capital cases in Florida, these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances." <u>Id.</u> Further, "in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." <u>Id.</u> <u>Hurst</u> applies to Davis because his sentences are before this Court on direct appeal.

This Court held in <u>Hurst</u> that the error that occurs when "the judge rather than the jury ma[kes] all the necessary findings to impose a death sentence, is not structural error incapable of harmless error review." <u>Id.</u> This Court then established the test for determining whether a <u>Hurst</u> error is harmless beyond a reasonable doubt, which we summarized in <u>Davis v. State</u>, 207 So. 3d 142 (Fla. 2016): "As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." <u>Id.</u> at 174; <u>see</u> <u>Hurst</u>, 202 So. 3d at

65-68. We turn now to review whether the Hurst error in Davis's case was harmless beyond a reasonable doubt.

The trial court imposed Davis's sentences following the jury's nonunanimous recommendations for death—nine to three for the murder of Hughes and ten to two for the murder of Rhodes. As a result, this Court is unable to determine or speculate why the dissenting jurors—three for the sentence related to Hughes and two for the sentence related to Rhodes—voted for a sentence of life imprisonment rather than the death penalty. This Court cannot determine whether these jurors did not find that sufficient aggravating factors had been proven to impose a sentence of death, that the aggravation did not outweigh the mitigation, or, for some other reason, determined that death was not an appropriate sentence. Thus, we conclude that the Hurst error in Davis's case was not harmless beyond a reasonable doubt. Accordingly, we vacate the sentences of death and remand for a new penalty phase.[10] Because we remand for a new penalty phase under Hurst, we decline to address Davis's other penalty phase claims and need not address the proportionality of his death sentences.

---

10. This Court has already rejected the argument that section 775.082(2), Florida Statutes (2016), requires that Davis's sentences of death be commuted to sentences of life imprisonment. See Hurst, 202 So. 3d at 44.

# CONCLUSION

Based on the foregoing, we affirm Davis's convictions, vacate Davis's sentences of death, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, POLSTON, and LAWSON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Walton County,
Kelvin Clyde Wells, Judge - Case No. 662013CF000124CFAXMX

Andy Thomas, Public Defender, and Richard M. Bracey, III, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, and Jennifer L. Keegan, Assistant Attorney General, Tallahassee, Florida,

for Appellee